# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### CENTRAL DIVISION

| | | |
|---|---|---|
| IN RE | ) | CHAPTER 11 |
| | ) | |
| 201 FOREST STREET LLC & | ) | |
| 219 FOREST STREET LLC | ) | CASE NOS. 07-42296-JBR |
| | ) | 07-41768-JBR |
| DEBTORS | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | |
| 201 FOREST STREET LLC, | ) | |
| 201 FOREST STREET REALTY TRUST, | ) | |
| 219 FOREST STREET LLC, & | ) | |
| 219 FOREST STREET REALTY TRUST | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | AP. NO. 07-4097 |
| | ) | |
| LBM FINANCIAL LLC & | ) | |
| MARCELLO MALLEGNI, | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## <u>MEMORANDUM OF DECISION</u>

This matter came before the Court for trial on the Plaintiffs'[1] Objection to LBM Financial

LLC's ("LBM") Claims and Counterclaims[2] against Defendants LBM and Marcello Mallegni

("Mallegni").  Counts I, III, & IX seek the disallowance of default rates of interest as

unenforceable penalties.  Counts II & IV seek declaratory judgments as to amounts owed on

certain promissory notes.  Count V requests the equitable subordination of LBM's claims.

---

[1] 201 Forest Street LLC and 201 Forest Realty Trust (collectively referred to as "201 Forest") and 219 Forest Street LLC and 219 Forest Realty Trust (collectively referred to as "219 Forest").

[2] Although the Plaintiffs commenced this adversary proceeding, they styled the causes of action in their pleading as "Counterclaims" because LBM had previously filed proofs of claims in both of the Plaintiffs' bankruptcy cases. The Court will refer to the Counterclaims individually as Counts.  201 Forest initially filed an objection to LBM's claim in its main case which was consolidated with this adversary proceeding on September 12, 2007.  *See* 201 Forest LLC, Case No. 07-42296, Docket # 102.

Counts VI, X, & XII allege unfair and deceptive acts or practices in violation of Mass. Gen. Law ch. 93A.[3] Count VIII seeks a declaratory judgment that a guaranty executed by 201 Forest is void. Count XI alleges breaches of the covenant of good faith and fair dealing.[4] The basis of the Objection to LBM's claims is the same facts and conduct that form the basis of the Plaintiffs' Counterclaims. Accordingly, the Objection to Claims will be sustained insofar as the Court finds for the Plaintiffs on their Counterclaims.

In reaching this decision, the Court considered the demeanor and credibility of the nine witnesses who testified as well as the seventy-one exhibits that were admitted into evidence and the arguments and submissions of counsel. This decision constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

It is appropriate to begin with a few words about credibility. The Court did not find Mallegni to be a credible witness. When faced with a difficult question Mallegni invariably responded that he could not recall. *See* Tr., Nov. 3, 2008, p. 75 (could not recall whether there was dispute over accuracy of payoff figures); p. 69-70 (could not recall what input he had when setting default rates); p. 84 (could not recall what factors he looked at when he set default rates). Moreover, Mallegni also testified inconsistently at times. *See* Tr., Nov. 3, 2008, pp. 132-133 (he knew Norris was asking a for lease release; he "never" knew); pp. 105, 176 (LBM has only foreclosed one or two times; LBM has foreclosed four or five times between 2001 and 2004 alone). As a result, the Court has rejected much of Mallegni's testimony.

The parties' relationship is over a decade old and involved several loans. The following overview of the tumultuous history shared by the parties will provide a helpful introduction.

---

[3] East Main Street Trust is mentioned several times in the Plaintiffs' Complaint. *See* Compl. ¶ 73. This appears to be a misnomer as East Main Street Trust was not mentioned in the Joint Pretrial Memorandum and there was no testimony regarding East Main Street Trust.
[4] Count VII was dismissed on September 25, 2007. (Docket #36).

# I.   INTRODUCTION

## A.   *The Debtors*

In 1997, 219 Forest acquired undeveloped property known as 219 Forest Street,

Marlborough, Massachusetts (the "219 Forest Property").  219 Forest Street Realty Trust is

managed by two brothers, David Depietri ("David") and Robert Depietri ("Robert").  David is

the trustee of 219 Forest Street Realty Trust of which 219 Forest Street LLC, a Massachusetts

Limited Liability Company, is the sole beneficiary.  At its inception, David and Kimberly

Depietri ("Kimberly") each owned 50% of 219 Forest.  Robert has never owned an interest in

219 Forest, but he makes all of its major business decisions.

 201 Forest is an entity that owns two office buildings with approximately 79,000 square

feet of rentable space adjacent to the 219 Forest Property.  David is the trustee of 201 Forest

Street Realty Trust of which 201 Forest Street LLC, a Massachusetts Limited Liability

Company, is the sole beneficiary.  David is the authorized agent of 201 Forest Street LLC.  There

was no evidence presented concerning the ownership of 201 Forest.

## B.   *The Origin of 219 Forest's Relationship with Mallegni*

The relationship between 219 Forest and Mallegni began on August 5, 1998 when

Wolfpen Financial, LLC ("Wolfpen"), and Clinton Management Corp. ("Clinton Management")

made a $1,200,000 loan to 219 Forest (the "August Note").  *See* Pls.' Agreed Ex. 2.[5]  At that

time, Mallegni and William Depietri ("William") each owned 50% percent of Wolfpen, *see* Tr.,

Nov. 3, 2008, p. 52, but only Mallegni was involved in its management.  William is a brother of

Robert and David, but he is not affiliated with 219 Forest and is not a party to this litigation.

William also owns several other companies including Rosewood Capital Corporation, a private

---

[5] The Defendants have previously referred to this Note as the "Clinton-Wolfpen Note."  *See* Defs.' Proposed
Findings of Fact and Rulings of Law (Docket # 183).

lending company.  *See* Tr., Nov. 7, 2008, p. 46.  Both Wolfpen and Clinton Management were

payees of the August Note; the Court finds each had a 50% interest, although the loan documents

introduced into evidence are silent on this point.  *See* Pls.' Agreed Ex. 2.  Wolfpen's ledger,

wherein Wolfpen appeared to track 50% of the August Note, supports this finding.  *See* Defs.'

Ex. 5.[6]  The August Note called for interest only payments at rate of 15% per annum and had a

maturity date of February 5, 1999.  *See* Pls.' Agreed Ex. 2.  219 Forest had the right to extend the

August Note for six months in exchange for a fee of 3% of the then outstanding balance to be

paid at the end of the extension period.  *Id.*  In the event of default, the August Note provided

that the interest rate would increase to 18% and two points on the then outstanding balance

would be due and payable to the lender.  *Id.*

  The August Note was not paid off on February 5, 1999.  Robert testified that 219 Forest

was current with its monthly interest payments at this point and paid Wolfpen the 3% fee

necessary to extend the term of the August Note for six months.  *See* Tr., Nov. 5, 2008, pp. 110-

111; Tr., Nov. 7, 2008, p. 12.  Wolfpen's ledger corroborates this testimony as it reflects that

Wolfpen received an $18,000 payment from 219 Forest (half of the 3% extension fee) on

February 4, 1999.  *See* Defs.' Ex. 5.[7]  This extended the term of the August Note to August 5,

1999 and as is discussed below, the amount needed to repay the August Note was contested.

C.    *Wolfpen Acquires 40% of 219 Forest and a Veto Power*

    Apparently pursuant to an agreement to which Robert testified but which, if it was

reduced to writing, was not offered in evidence, David and Kimberly each transferred a 20%

interest in 219 Forest to Wolfpen on April 26, 1999.  *See* Tr., Nov. 5, 2008, pp. 110, 114; Pls.'

---

[6] Wolfpen and Clinton Management appear to have administered their interests in the August Note separately as
Wolfpen's ledger lists an original principal balance of $600,000 rather than $1,200,000.  *See* Defs.' Ex. 5.
[7] As Wolfpen only tracked half of the August Note, accounting for only half of the extension fee on its ledger is
consistent with the unorthodox manner in which the August Note was administered.

Agreed Exs. 4-5.  Robert testified that "Wolfpen had an option to acquire 40 percent of the property prior to the expiration of the [August] [N]ote *or* be paid [a] $100,000 exit fee upon expiration of the note."[8]  *See* Tr., Nov. 5, 2008, p. 110.  Mallegni testified, however, that Robert simply "gave" the 40% interest to Wolfpen because it had "put up money and [] help[ed] them with the loans," but he could not remember if Wolfpen had given any other consideration beyond the loans.  *See* Tr., Nov. 3, 2008, pp. 63-65.

The Court does not find Mallegni's version credible as there was no evidence that the parties to this litigation were ever exchanging "gifts," nor is it credible that the owners of 219 Forest would give away almost half of the company at a time when 219 Forest had already obtained an extension of the August Note and was current on its interest payments.  The transfers were made in lieu of a cash "exit fee."  As a result of these transfers, Kimberly and David each owned 30% of 219 Forest, and Wolfpen owned 40% of 219 Forest.  Curiously, Wolfpen's 50% owner, William, was not aware that Wolfpen acquired 40% of 219 Forest.  *See* Tr., Nov. 7, 2008, p. 78.  These transfers were significant, to say the least, as 219 Forest's LLC agreement was structured in a manner that prevented 219 Forest from entering into any financing transaction unless it first procured the assent of its then lender and its new 40% owner, Wolfpen.  *See* Tr., Nov. 5, 2008, p. 204 ("The way the partnership was structured it took more than 60% to approve any financing transaction, and [Mallegni] had the deciding vote.").  It was not contradicted at trial that Wolfpen's interest in 219 Forest provided it with this veto power.  Wolfpen's acquisition of this veto power dramatically shaped the dealings that unfolded between 219 Forest and Mallegni over the next six and a half years.

---

[8] There is no such term contained in the August Note.

D.    *The Wolfpen and Hudson Notes*

At or around the time that the August Note extension was set to expire, a principal of

Clinton Management arrived at David and Robert's office with a gun and demanded to be repaid.

*See* Tr., Nov. 5, 2008, pp. 198-199.  The principal of Clinton Management was accompanied by

Mallegni during this visit.  In response to this pressure, 219 Forest obtained loans from Hudson

Savings Bank and Wolfpen on September 1, 1999 to pay off the August Note.  The purported

payoff on the August Note, $1,311,015.00, was much higher than what Robert believed 219

Forest owed.  *See* Tr., Nov. 5, 2008, p. 116.

The Hudson Savings Bank loan was in the amount of $650,000 (the "Hudson Note"). *See*

Pls.' Agreed Ex. 6.  After closing costs and real estate taxes, which totaled $49,381.60, were

deducted, $600,618.40 was applied to the $1,311,015.00 alleged balance of the August Note.

*See* Defs.' Ex. 6.  According to the Hudson Note closing statement, $710,396.60 remained owing

on the August Note after the Hudson Note proceeds were applied.  *Id.*  Although Robert objected

to this amount, 219 Forest obtained a loan from Wolfpen in the amount of $734,688.10 (the

"Wolfpen Note")[9] to satisfy it.[10]  *See* Pls.' Agreed Ex. 3.  Robert testified that 219 Forest was

current on the August Note at this time and alleged that the $710,396.60 figure included a

$100,000 "exit fee" to which Wolfpen was not entitled because it had already received the 40%

interest in 219 Forest in lieu of the "exit fee."  *See* Tr., Nov. 5, 2008, pp. 111-117.  Again,

Wolfpen's own ledger supports this contention.  Although the ledger is somewhat confusing in

that at least Wolfpen's share of the August Note is recorded as "Loan # 45" and a $50,000

---

[9] The parties have previously referred to the Wolfpen Note as the "Wolfpen Note II," *see* Joint Pretrial Mem.
(Docket # 157), and the "September Note." *See* Pls.' Proposed Findings of Fact and Conclusions of Law (Docket #
184).
[10] The principal balance of the Wolfpen Note is $24,291.50 greater than what was owed on the August Note after the
Hudson Note proceeds were applied because of Wolfpen's closing costs such as a 3% loan origination fee,
attorney's fees, and title insurance.  *See* Defs.' Ex. 6.

payment, recorded as "interest" is noted as a September 1, 1999 payment recorded for "Loan #

1395," there was no evidence that 219 Forest had another loan with Wolfpen at that time.

Mallegni told Robert that the loan would not close unless 219 Forest agreed to pay the "exit fee."

*See id.* p. 117. Except for August 1999, when no payment is entered, Wolfpen's ledger indicates

that 219 Forest had timely made all of its monthly interest payments on the August Note. *See*

Defs.' Ex. 5. Neither Mallegni nor any other witness plausibly explained how Wolfpen's payoff

figure was calculated. Consequently, the Court finds that Wolfpen, acting through Mallegni,

extracted at least 50% of the $100,000 exit fee to which it was not entitled. *See infra* Section II.

D. 1.

The Wolfpen Note was secured by a mortgage on the 219 Forest Street Property. The

Wolfpen Note called for interest only payments at a rate of 12% per annum and had a maturity

date of September 1, 2000. In the event of default, the Wolfpen Note provided that the interest

rate would increase to 20% per annum and an administration fee of 3% of the then outstanding

balance would be immediately due and payable to the lender. The Hudson Note also had a

maturity date of September 1, 2000. The Hudson and Wolfpen Notes were not paid upon

maturity. Neither Hudson nor Wolfpen declared the Notes to be in default nor demanded

payment.

E.    *The Commerce and March Notes*

In March 2001, 219 Forest began to seek financing with Commerce Bank and Trust

Company ("Commerce") to pay off the Hudson and Wolfpen Notes. Mallegni "assist[ed]" 219

Forest with its efforts to secure financing through Commerce. *See* Joint Pretrial Mem., § G., ¶

25. Although Mallegni's "assistance" may appear innocuous at first blush, this was the first of

many instances where Mallegni manipulated the direction that 219 Forest took with respect to its

financing.

On March 20, 2001, 219 Forest borrowed $1,800,000 from Commerce (the "Commerce

Note"). *See* Pls.' Agreed Ex. 9. Of the $1,800,000, $125,000 was earmarked to pay for

architectural and engineering costs and $225,000 was to be held in escrow for the payment of

interest and real estate taxes. *See* Pls.' Agreed Ex. 8. The Commerce Note had a contract rate of

interest of 2.5% above Commerce's corporate base rate and a default rate of interest of 4%

greater than the contract rate. The Commerce Note had a maturity date of March 20, 2002 and

was secured by a mortgage on the 219 Forest Property. Commerce required Robert and David to

personally guaranty 219 Forest's obligations and also required Mallegni to execute a repurchase

agreement, wherein Mallegni agreed to purchase the Commerce Note in the event of 219

Forest's default. *See* Pls.' Agreed Exs. 14, 15, 17. Robert was aware of the repurchase

agreement. *See* Tr., Nov. 5, 2008, p. 141. In exchange for Mallegni's agreement to sign the

repurchase agreement, 219 Forest executed an agreement that obligated David and Kimberly to

assign their remaining interests in 219 Forest to Mallegni in the event that Mallegni was called

upon to purchase the Commerce Note (the "March Agreement"). *See* Pls.' Ex. 18; Tr., Nov. 5,

2008, pp. 147-148.

The net proceeds of the Commerce Note were used to pay off the Hudson Note in full

and $670,779 was applied to the Wolfpen Note. *See* Joint Pretrial Mem., § G., ¶ 27. The

proceeds of the Commerce Note did not fully satisfy the $907,518 that Wolfpen claimed it was

owed on the Wolfpen Note. *See id.* ¶¶ 27-30; Tr. Nov. 3, 2008, pp. 75-80; Tr., Nov. 5, 2008, p.

135. Robert could not recall whether 219 Forest was current on the Wolfpen Note at this point

and Wolfpen's ledger reflects that 219 Forest had not made a payment since May 2, 2000. *See*

Tr., Nov. 5, 2008, p. 128; Defs.' Ex. 5.  Although Robert voiced his position that the $907,518 figure was inaccurate, he eventually yielded to Wolfpen's figures as Mallegni, exercising his control of Wolfpen, threatened to veto the Commerce Note financing, stating that it "wasn't going to happen unless [219 Forest] agreed to this number."  *See* Tr., Nov. 5, 2008, pp. 135-136. Mallegni did not provide 219 Forest with an explanation, let alone documentation, of how the $907,518 figure was arrived at, *see* Tr., Nov. 5, 2008, p. 135, rather, he simply threatened to wield Wolfpen's veto power if 219 Forest did not agree to that figure.

Mallegni's threat was successful as 219 Forest paid off the full amount that Wolfpen claimed it was owed on the Wolfpen Note by obtaining a loan from LBM in the amount of $236,738.82 on March 20, 2001 (the "March Note").  *See* Pls.' Agreed Ex. 16.  Mallegni owns 96%[11] of LBM and manages LBM.  LBM, rather than Wolfpen, made this loan because at some point in 2000 Mallegni stopped making loans through Wolfpen; no further explanation of this change in lenders was offered.  *See* Tr., Nov. 3, 2008, p. 54.  The March Note called for interest only payments at a rate of 16% per annum and had a maturity date of March 20, 2002.  In the event of default, the March Note provides that the interest rate would increase to 20% per annum plus one point per month until the entire balance was paid in full.  Furthermore, if any payment was more than five days late, LBM was entitled to collect a monthly late charge of 10% of the overdue amount.  Any unpaid interest, penalties, and fees were to be added to the principal balance.  When the 20% interest rate, one point per month, and the 10% late charges are compounded each month over a 12-month period, the effective annual default rate of interest on the March Note is 41%.  *See* Tr., Nov. 5, 2008, pp. 88-89.

---

[11] The remaining 4% of LBM is owned by Leamar Industries LLC and Stone Services LLC.  Mallegni is the 100% owner of both of those entities.

F.   *The Cranston Commons Assignment*

As a condition to lending under the March Note, Mallegni required Robert and Rosewood Management Corporation, a real estate management and development company with which Robert is affiliated,[12] to assign to LBM reimbursements due to Robert and Rosewood Management Corporation from an entity known as Cranston Commons LLC (the "Cranston Commons Assignment").  Rosewood Management Corporation and Cranston Commons LLC are not parties to this litigation.  The March Agreement executed by Mallegni and 219 Forest provides that this assignment was made to "secure the payment" of the money lent by LBM under the March Note.  *See* Pls.' Agreed Ex. 18, ¶¶ 9-10.  In addition, William, who was a 50% participant in the March Note, testified that it was agreed that monies received from the Cranston Commons Assignment would be applied to the balance owed on the March Note.  *See infra* Section II. C.; Tr., Nov. 7, 2008, pp. 70-71.  Pursuant to the Cranston Commons Assignment, LBM received payments and applied them to the March Note.  *See* Joint Pretrial Mem., § G., ¶ 33.

On June 17, 2002, LBM received a payment from the Cranston Commons Assignment in the amount of $32,459.11.  This payment was initially applied to the March Note leaving a balance owed of $85,588.46.  *See* Pls.' Ex. P.  Susan Alden ("Alden") is Mallegni's assistant at his entity Leamar Industries and she also works for Mallegni administering and collecting LBM's loans.  Alden testified that "someone" from Robert's office instructed LBM to re-apply the $32,459.11 payment to four other loans on which 219 Forest was not obligated.  *See* Tr., Nov. 4, 2008, p. 67-69.[13]  When questioned further as to who this "someone" was, Alden

---

[12] Rosewood Management Corporation is not to be confused with brother William's Rosewood Capital Corporation.
[13] Although the evidence was thin and unclear on this point, it appeared that David and Robert, or other entities that they were affiliated with, were obligated on the loans to which the payment was purportedly re-applied.  *See* Transcript, Nov. 3, 2008, p. 212.

testified that "I think it *probably* would have been Bobby Depietri." *See id.* pp. 67-68. Robert

testified that he never instructed Alden to re-apply the payment. *See* Tr., Nov. 5, 2008, p. 146.

The Court finds that no such authority from Robert was given. *See infra* Section II. C. The June

17th payment was the last payment that LBM received on account of the March Note.

### G.   *The First Essex Financing Proposal*

As the end of 2001 approached, 219 Forest sent packages to financial institutions to

solicit construction loans for the development of the 219 Forest Property. First Essex Bank

("First Essex") expressed interest and issued a commitment letter in March or April of 2002.[14]

During this time, Commerce extended the maturity date of the Commerce Note to June 18, 2002.

As 219 Forest needed Wolfpen's assent before it could commit to any financing, it showed First

Essex's commitment letter to Mallegni who said "it looked good [and] he wanted to review it."

*See* Tr., Nov. 5, 2008, p. 119. The next day, however, Mallegni told 219 Forest that he spoke

with the Chairman of Commerce, David Massad ("Massad"), about First Essex's commitment

letter and that Commerce wanted to do the construction financing. *See id.* pp. 120, 203. This

communication with Massad, coupled with the fact that Mallegni had previously "assisted" 219

Forest in securing the Commerce Note, aroused the Court's suspicions that Mallegni may have

had an undisclosed relationship with Commerce. Notwithstanding Robert's and David's desire

to pursue the First Essex financing, Mallegni, empowered by Wolfpen's veto power, refused

(without any apparent regard as to what was in 219 Forest's best interests) to consider the First

Essex proposal any further. *See* Tr., Nov. 5, 2008, pp. 119-120, 203-205 ("I don't want to go

with this . . . because Duddie [Massad] wants to do the construction loan."). Mallegni effectively

---

[14] This commitment letter was not proffered as an exhibit.

seized control of 219 Forest's financing options and steered it back to Commerce for the second time.

As Mallegni singlehandedly foreclosed the prospect of the First Essex financing, Robert reluctantly met with Mallegni, Massad, and one of Commerce's senior loan officers to discuss construction financing. *See* Tr., Nov. 5, 2008, pp. 120-121, 204 ("My choice was to go to Essex, and my brother's choice was to go to Essex."). Commerce issued a loan proposal, dated May 13, 2002, that mirrored the terms of the First Essex commitment. *See* Pls.' Ex. O. Robert, David, and Mallegni, on behalf of Wolfpen, signed the proposal, but did not hear back from Commerce for several weeks. The senior loan officer eventually contacted Robert and said that Commerce had lost the entire loan file. Subsequent to this communication, Robert re-sent all of the necessary information to Commerce. Near the end of June of 2002, Commerce issued a far different proposal; Commerce's revised proposal was $1,500,000 less than the initial proposal and less than 219 Forest needed to refinance its existing loans and complete construction.[15] 219 Forest never secured a construction loan. The maturity date of the Commerce Note was extended a second time to August 31, 2002.

### H.   *The December Note and the 201 Forest Guaranty*

The Commerce Note was not paid on August 31, 2002. Pursuant to the repurchase agreement, Mallegni purchased the Commerce Note from Commerce on November 27, 2002. *See* Joint Pretrial Mem., § G., ¶ 36; Pls.' Agreed Ex. 23. On multiple occasions, Mallegni told Robert that Commerce wanted to be repaid by end of the year. Specifically, Mallegni told Robert that 219 Forest needed to get the Commerce Note "paid off before the end of the year because [Commerce] wanted it off their books." *See* Tr., Nov. 5, 2008, p. 150. Robert also

---

[15] This "revised" proposal was not proffered.

testified that Commerce's attorneys were sending letters that expressed the urgency to have the
Commerce Note paid off by the end of the year. *Id.* Mallegni represented that he could arrange
a loan through LBM to pay off the Commerce Note. On December 4, 2002, 219 Forest obtained
a loan from LBM in the amount of $1,733,632 (the "December Note"). *See* Pls. Agreed Ex. 27.
The proceeds of the December Note were used to pay off the Commerce Note. At the closing,
Mallegni again told Robert that Commerce needed to be repaid by the end of the year, and failed
to disclose the fact that he had already purchased the Commerce Note on November 27, 2002.
*See* Tr., Nov. 5, 2008, p. 151-152; *see infra* Section II. D. 1. As 219 Forest was laboring under
the misimpression, created by Mallegni, that Commerce needed to be repaid at the closing of the
December Note, Mallegni was again successful in manipulating 219 Forest's financing
decisions. Robert was not apprised of Mallegni's purchase of the Commerce Note until one
week before trial. *See id.* p. 151.

The December Note is secured by a mortgage on the 219 Forest Property. *See* Pls.'
Agreed Ex. 28. The December Note called for interest only payments at a rate of 14% per
annum and had a maturity date of December 4, 2003. In the event of default, the December Note
provides that the interest rate would increase to 20% per annum, plus one point per month until
the entire balance was paid in full. Furthermore, if any payment was more than fifteen days late,
LBM was entitled to collect a monthly late charge of 10% of the overdue amount. Any unpaid
interest, penalties, and fees were to be added to the principal balance. The effective annual
default rate of interest on the December Note is also 41%. *See* Tr., Nov. 5, 2008, pp. 88-89;
*supra* Section I. E. Prior to and following the execution of the March and December Notes,
LBM sent notices to the Attorney General of the Commonwealth of Massachusetts that stated its
intent to charge interest rates in excess of 20% per annum. *See* Joint Pretrial Mem., § G., ¶ 64.

13

The terms of the December Note were much more onerous than were the terms of the Commerce

Note which Mallegni held personally.  *See infra* Section II. D. 1.

At least three investors participated in the December Note.  *See* Pls.' Agreed Exs. 35-37.

Mallegni told Robert that his investors would only participate in the December Note if additional

collateral secured the loan.  *See* Tr., Nov. 5, 2008, pp. 152-155.  The only investor in the

December Note that the Defendants called as a witness was William.[16]  William testified at

length about his participation in the December Note, but he never stated that his participation

was contingent upon additional collateral, nor did *any* of the other witnesses who testified.  *See*

Tr., Nov. 7, 2008, pp. 67-70, 75-77.  At Mallegni's insistence, 201 Forest reluctantly guaranteed

the December Note (the "201 Forest Guaranty") and granted LBM a mortgage on its property

(the "201 Forest Property").  *See* Pls.' Agreed Exs. 31-32; Tr., Nov. 5, 2008, p. 154-155 ("We

tried to object to . . . the 201 Forest Street [G]uarantee.").  Prior to this transaction, 201 Forest

had not guaranteed any of 219 Forest's obligations and based on the record before this Court this

was 201 Forest's first and only dealing with LBM and Mallegni.  *See* Tr., Nov. 5, 2008, p. 152-

153.  As further security, Robert and David personally guaranteed the December Note.

I.    *The Default Rates of Interest*

Mallegni made all of LBM's major business decisions and would determine what the

contract rate of interest and default rate of interest would be on loans that LBM made.  If

Mallegni had investors on LBM loans, he testified that he would consult with them before setting

the rates.  Alden and David Kozik ("Kozik"), who also worked for Mallegni as LBM's chief

accountant, had no role in setting the rates and fees on LBM loans.  All of LBM's loans had

compounding default interest rates.  Mallegni testified that he set the default rates of interest

---

[16] William's investment in the December Note was in the name of his entity Rosewood Capital Corporation.  *See*
Pls. Agreed Ex. 35.

based upon risk, the value of the collateral, and how hard he would have to work to collect the
money. Mallegni did not produce any analysis nor did he identify any documents that either
detail or enumerate additional costs that LBM has incurred when loans have gone into default.
LBM has never conducted an analysis of additional costs that it incurs and risks it experiences
when loans go into a default. LBM's certified public accountant, Robert Elder, was capable of
providing LBM with such an analysis, but he was never asked to do so. *See* Tr., Nov. 3, 2008,
pp. 41-43, 45-46. Mallegni, Alden, and Kozik have never tracked the amount of time that they
work attempting to collect defaulted loans. Kozik and Mallegni testified that LBM had very
little costs associated with the collection of unpaid loans in 2001 and 2002. *See* Tr. Nov. 3, 2008
pp. 109-110, 257. Mallegni testified that defaulted loans have prevented LBM from earning
points on new loans, but Mallegni could not identify a single loan that LBM was unable to make
as a result of defaulted loans. *See* Tr., Nov. 3, 2008, pp. 118-119; 246-248.

J.    *Negotiations to Extend the December Note*

In late 2003, 219 Forest sought to extend the maturity date of the December Note. The
December Note did not contain any provisions governing extensions. On December 19, 2003,
Mallegni, Robert, and David met and 219 Forest proposed an extension of the loan for one year
on its existing terms in exchange for a one-point extension fee. *See* Tr., Nov. 5, 2008, p. 157.
Mallegni said he wanted to go back to his office and talk to LBM's attorney, Michael Norris
("Norris"), about it. Robert contacted Mallegni two times over a period of approximately three
weeks after the meeting because he had not heard anything about the status of the extension. *See*
Tr., Nov. 5, 2008, p. 159. On one occasion, Mallegni told Robert not to worry about it because
Norris was very busy. *Id.* On January 12, 2004, Robert sent a proposed extension agreement to
LBM, which, according to Robert, incorporated the terms discussed at the December 19th

15

meeting.  *See* Pls.' Agreed Ex. V.  Robert spoke with Mallegni again, and Mallegni told Robert

that Norris would get the loan documents to them.

On January 30, 2004, Norris sent a letter to 219 Forest stating that Mallegni would agree

to an extension of the December Note if he, Norris, was released from the six or seven years

remaining on his lease, a $600,000 obligation, with 65 Boston Post Realty Trust.  *See* Pls.' Ex.

X; Tr. Nov. 5, 2008, p. 175.  It appears to the Court that this was a tactical delay designed to

leave 219 Forest with no choice.  David and unrelated third parties had interests in the 65 Boston

Post Realty Trust.  *See id.* p. 174-175.  Robert told Mallegni that 219 Forest could not release

Norris from his lease with 65 Boston Post Realty Trust.  *See id.* p. 173.  Another meeting to

discuss an extension of the December Note was held in March of 2004 and David told Norris

that he could not release him from the lease with 65 Boston Post Realty Trust.  *See id.* p. 174.  A

heated argument ensued and Norris said that it was not his problem because Mallegni had told

him that he would take over the lease.  *See id.* pp. 173-174.  The extension agreement only

became unacceptable to 219 Forest because it was conditioned on the lease release.  *See* Tr.,

Nov. 5, 2008, p. 207.  Although there was some discussion as to whether the extension fee would

be one point or three points, it did not occasion the failure to execute an extension agreement.

*See* Tr., Nov. 3, 2008, p. 204 ("Bobby always agreed to pay the[] points.");  *see also* Tr., Nov. 5,

2008, p. 207.  Mallegni was willing to execute an extension and there was no evidence that he

objected to any of its terms.  *See* Tr., Nov. 3, 2008, pp. 203-204.  The lease release was the sole

cause of the parties' failure to execute an extension of the December Note.  Approximately one

week after the March 2004 meeting, Norris sent 219 Forest another letter which stated that the

December Note could only be extended if he was simultaneously released from his lease with 65

Boston Post Realty Trust.  *See* Pls.' Ex. Y.  A written extension agreement was never executed.

Notwithstanding the fact that Norris was not released from his lease, he moved out of 65 Boston

Post Road and into Mallegni's (or one of his entity's) building on Locke Drive in Marlborough.

*See* Tr., Nov. 5, 2008, p. 177; *infra* II. E. 2.

Notwithstanding the failure to execute an extension of the December Note, 219 Forest

continued to make monthly payments to LBM through February 2006 at the contract rate of

interest.[17]  Although LBM accepted and applied each of those payments without verbal protest,

Alden sent a letter to 219 Forest on January 8, 2004, which stated that the December Note was in

default for failure to pay the principal balance in full by the maturity date, and the interest rate

was increasing to "20% and one point per month."  *See* Pls.' Agreed Ex. 39.  The December

Note provides that "the acceptance by the Holder of partial payments hereunder shall not

constitute a waiver of any . . . default [and the Holder's options upon default] shall remaining

continuously in force."  *See* Pls.' Agreed Ex. 27.  Between August of 2004 and October of 2006,

LBM sent monthly statements to 219 Forest which showed the application of the contract rate

payments and the assessment of the default interest on the December Note.  *See* Defs.' Ex. 19;

Tr., Nov. 4, 2008, p. 87.  The payments that 219 Forest made on account of the December Note

through February of 2006 total $759,738.  *See* Joint Pretrial Mem., § G., ¶ 63.  LBM did not

receive any payments on account of the December Note after February 20, 2006.

K.    *Attempts to Refinance with National City*

In early 2005, 219 Forest applied for construction loans and began to market units of the

proposed building for sale as office condominiums.  On September 27, 2005, 219 Forest

obtained a construction loan proposal from National City Bank ("National City").  *See* Pls.' Ex.

CC.  A portion of the National City proceeds was intended to pay off the December and March

---

[17] 219 Forest made this payment every month from December of 2003 through February of 2006 except for August of 2005 when no payment was made.

Notes in full.  Robert and David sent the proposal to Mallegni as 219 Forest needed the prior

approval of its 40% owner, Wolfpen, before it could obtain financing.  *See* Tr. Nov. 5, 2008, pp.

119, 204; Nov. 7, 2008, p. 19.  Mallegni appeared interested and did not object its terms.  *See*

Tr., Nov. 5, 2008, p. 180 ("Are they willing to do it?").  David signed the proposal and returned

it to National City with a $10,000 deposit.  *See* Tr., Nov. 5, 2008, pp. 181-182.  Pursuant to

National City's requirements, 219 Forest obtained appraisals (presumably at some cost) of the

219 Forest Property.  In early November, Robert told Mallegni that he planned to move forward

with the National City refinancing and that 219 Forest needed payoff figures for the March and

December Notes.  On November 15, 2005, Robert sent a letter to Mallegni requesting written

payoff figures for the December and March Notes.  *See* Pls. Agreed Ex. 40; Tr., Nov. 5, 2008,

pp. 188-189.  Mallegni failed to respond to Robert's letter with written payoff figures.  At one

point, Mallegni verbally told Robert that the payoff figure was "around" $3,500,000, but he did

not provide Robert with an exact figure, much less a written one.  *See id.* pp. 189-190.

Robert sent a second letter to Mallegni on November 30, 2005 again requesting written

payoff figures and stating that the $3,500,000 verbal payoff figure was incorrect.  *See* Pls.

Agreed Ex. 41; Tr., Nov. 5, 2008, p. 189.  Staying true to form, Mallegni also ignored this

request for written payoff figures.  *See* Tr., Nov. 5, 2008, p. 190.  219 Forest never received

written payoff figures from Mallegni and was unable to close on financing with National City.

*See id.* pp. 190-191.  Mallegni, as a seasoned lender, understands that written payoff figures are a

necessity for borrowers attempting to refinance as he has been in the business for several years

and owns at least one lending entity.  Mallegni never explained, but the Court suspects the reason

for Mallegni's refusal to provide 219 Forest with accurate written payoffs was that LBM had

pledged the December Note to Danvers Bank.  *See infra* Section II. E. 3.  Mallegni's intentional

failure to provide 219 Forest with written pay off figures was his final, but yet another, successful creation of an obstruction to 219 Forest's financing options and may have very well sealed 219 Forest's financial fate.

L.      *The Bankruptcy Filings*

What had started out as a seemingly typical lending relationship between 219 Forest and Wolfpen in 1998 gradually transformed into a situation where Mallegni and LBM garnered more and more control over 219 Forest and other entities, including obtaining the 40% ownership in 219 Forest, the assignment of Rosewood Management's right to reimbursements from the Cranston Commons, the mortgage on the 201 Forest Property, and ultimately dominated 219 Forest's decision making process culminated by Mallegni's overt refusal to provide 219 Forest with the payoff figures necessary to move forward with its prospective financing with National City.  This oppressive situation reached its nadir on May 19, 2007 and June 19, 2007 when 219 Forest and 201 Forest respectively filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  The Court allowed 219 Forest's motion for the joint administration of its case with 201 Forest's case on July 7, 2007.  *See* 219 Forest LLC, Case No. 07-41768, Docket # 48.

LBM filed proofs of claims, signed by Mallegni, in both cases.  The proof of claim filed in 219 Forest's case (the "219 Claim") is premised on the March and December Notes and was filed on May 25, 2007.  *See* Pls.' Agreed Ex. 42.  It asserts a claim of $5,003,243.38.  The 219 Claim itemizes the amount owed on the March Note as follows: $236,738.82 for principal, $367,840.01 for interest, $48,152.82 for late fees, and $75.00 for bounced check fees.  The 219 Claim itemizes the amount owed on the December Note as follows: $1,733,632.35 for principal and $2,556,711.81 for interest.  Finally, the 219 Claim includes $60,092.57 for attorney's fees and expenses through April 30, 2007.  The proof of claim filed in 201 Forest's case (the "201

Claim") is premised on 201 Forest's guaranty of the December Note and was filed on July 6, 2007. *See* Pls.' Agreed Ex. 43. It asserts a claim of $4,548,188.47. The 201 Claim itemizes the amount owed on the December Note as follows: $1,733,632.35 for principal, $2,726,114.75 for interest, and $88,714.37 for attorney's fees and expenses through May 31, 2007.

The 219 Forest Property was sold with the Court's approval on September 18, 2007. Pursuant to a stipulation approved by this Court, $2,147,827.78 was paid to LBM. Pursuant to the stipulation, $900,000 was to be applied to the principal balance due on the December Note. Of the total $2,147,827.78 received, $1,434,928.56 was applied to the December Note and the remainder was applied "on account" of LBM's claims with respect to the March Note.

## II.    DISCUSSION

### A.    <u>Counts I, III, IX: Disallowance of the Default Rate of Interest on the December Note and March Note as Unenforceable Penalties</u>

219 Forest and 201 Forest object to the default rates in both the December and March Notes because the effective annual default rates exceed 41%. *See supra* Sections I. E., I. H.[18] The Defendants did not contradict or otherwise challenge this calculation. *See* Tr., Nov. 5, 2008, pp. 88-105.

The starting point for analyzing whether a claim is allowable is 11 U.S.C. § 502. *Gencarelli v. UPS Capital Business Credit*, 501 F.3d 1, 5 (1st Cir. 2007).[19] Section 502(b)(1) disallows any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or *applicable law* for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1) (emphasis added). "This provision is most naturally

---

[18] The default rate for the March Note exceeds the contract rate by 25% while the default rate for the December Note exceeds that contract rate by 27%. LBM provided the Attorney General with notice of its intent to charge interest in excess of 20% pursuant to the Massachusetts usury statute. M.G.L.c. 271, § 49(d). *See supra* Section I. H.

[19] Contrary to the belief of some, in *Gencarelli* the First Circuit did not give a blank check to lenders to charge any rates whether reasonable or unreasonable.

understood to provide that, with limited exceptions, any defense to a claim that is available

outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Surety Co.*

*of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007). "Creditors' entitlements in

bankruptcy arise in the first instance from the underlying substantive law creating the debtor's

obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v.*

*Illinois Dep't of Revenue,* 530 U.S. 15, 20 (2000). Thus, at least in the first instance, whether the

portion of LBM's claim for default interest at greater than 41% may be allowed, turns on

whether this default interest rate is permissible under Massachusetts law.

The Debtors, as the parties challenging the validity of the default rates, bear the burden of

proving their unenforceability. *NPS, LLC v. Minihane*, 451 Mass. 417, 420, 886 N.E.2d 670,

673 (2008). "Any reasonable doubt as to whether a provision constitutes a penalty or a

legitimate liquidated damages clause should be resolved in favor of the aggrieved party." *TAL*

*Fin. Corp. v. CSC Consulting, Inc,*. 446 Mass. 422, 430, 844 N.E.2d 1085, 1092 (Mass. 2006).

Massachusetts law examines a default interest rate to ascertain whether it is a permissible

liquidated damages clause or an unenforceable penalty. *De Cordova v. Weeks*, 246 Mass. 100,

104-05, 140 N.E. 269, 270-71 (1923). In *De Cordova* the court refused to let a default rate of

36%, which was double the contract rate, stand and stated

> But even if the lenders should be allowed interest only at the rate of
> 18 per cent., the second question is whether they are entitled to
> interest at the rate of 36 per cent. on the amount of the note at
> maturity as well as on the sums due for premiums, computed after
> September 10, 1917, the date when the plaintiff inexcusably failed
> to comply with the demand for additional insurance. The clause in
> the assignment under which the right to double the interest is
> asserted is in these words:
>
> > 'Any failure on my part to furnish such additional
> > policies of life insurance shall give the right to the
> > lenders to charge interest upon all sums owing from me

> to the lenders at the date of such default, at double the
> rate of interest which the said indebtedness then bears.'
> The parties undoubtedly had the right to make their own contracts.
> The increased amount, however, to be paid on default being
> obviously greater than the damages for nonpayment of the note or
> moneys advanced for premiums, with interest at the rate of 18 per
> cent., which could be separately and readily calculated and exactly
> ascertained, the stipulation should not be held to have been
> intended as compensation or liquidated damages, or an agreement
> to pay a larger percentage for a continuance of the loan, and
> extension of time for repayment of advancements. . . . We are
> accordingly of opinion that the stipulation considered in connection
> with all the attendant circumstances should be deemed a penalty for
> the plaintiff's nonperformance which a court of equity will not
> enforce because it is unreasonable, unconscionable and oppressive.

*Id.* (citations omitted).

Despite LBM's argument to the contrary,[20] the same analysis remains valid in cases

where the lender complied with the state's criminal usury statute. *Fleet Bank of Massachusetts,*

*N.A. v. One-O-Six Realty, Inc.*, 94-3392-G, 1995 WL 389862, at *2 (Mass. Super. Ct. Jan. 17,

1995). In *One-O-Six Realty* the trial court analyzed the default interest rate as if it were a

liquidated damages clause and noted:

> The amount of liquidated damages specified in a contract must be
> reasonably related to the anticipated damages *and* to the actual loss
> caused by the breach. *Colonial at Lynnfield, Inc. v. Sloan,* 870 F.2d
> 761, 764 (1st Cir.1991), citing *Security Safety Corp. v. Kuznicki,*
> 350 Mass. 157, 158 (1966); *A-Z Service Center v. Segall,* 334
> Mass. 672, 675 (1956); *Lynch v. Andrew,* 20 Mass.App.Ct. 623,
> 627 (1985); Restatement (Second) of Contracts § 356 (1981). "A
> provision setting an unreasonably large liquidated damages amount
> is unenforceable on public policy grounds as a penalty." *Sloan,*
> *supra* at 764 (citations omitted).

*Id.*

---

[20] LBM argues that the enactment of the Massachusetts usury statute, M.G.L. c. 271 § 49 and its compliance with
that statute removes its charging the default rates at issue from the Court's scrutiny. LBM cites *Begelfer v.
Najarian*, 381 Mass. 177, 186, 409 N.E.2d 167, 173 (Mass. 1980), in support of this argument. The case, however,
does not so hold. It held that a lender who charged more that 20% interest (when the default rate was included) and
who did *not* register as required by the usury law, could not receive the usurious rate. Nothing in the case says the
opposite is true. In fact, the court stated: "Alternatively, apart from the statute, we also consider whether the
difference between $48,487.50 and $99,522.50 due to the default (see note 4 supra) was 'so disproportionate to the
damages caused to the (defendants) by the (plaintiffs') breach of the agreement that it amounts to a penalty.'" *Id.*

Recently in *NPS, LLC*, the Supreme Judicial Court reiterated the basic principles for

determining whether a contract provision is a permissible as liquidated damages or

unenforceable as a penalty.

> It is well settled that "a contract provision that clearly and
> reasonably establishes liquidated damages should be enforced, so
> long as it is not so disproportionate to anticipated damages as to
> constitute a penalty." *TAL Fin. Corp. v. CSC Consulting, Inc.,*
> *supra* at 431, 844 N.E.2d 1085. A liquidated damages provision
> will usually be enforced, provided two criteria are satisfied: first,
> that at the time of contracting the actual damages flowing from a
> breach were difficult to ascertain; and second, that the sum agreed
> on as liquidated damages represents a "reasonable forecast of
> damages expected to occur in the event of a breach." *Cummings*
> *Props., LLC v. National Communications Corp., supra* at 494, 869
> N.E.2d 617. Where damages are easily ascertainable, and the
> amount provided for is grossly disproportionate to actual damages,
> or unconscionably excessive, the court will award the aggrieved
> party no more than its actual damages. *A-Z Servicenter, Inc. v.*
> *Segall,* 334 Mass. 672, 675, 138 N.E.2d 266 (1956). Since there is
> "no bright line separating an agreement to pay a reasonable
> measure of damages from an unenforceable penalty clause," *TAL*
> *Fin. Corp. v. CSC Consulting, Inc., supra,* the reasonableness of the
> measure of anticipated damages depends on the circumstances of
> each case. *A-Z Servicenter, Inc. v. Segall, supra.* In assessing
> reasonableness, we look to the circumstances at the time of contract
> formation; we do not take a "second look" at the actual damages
> after the contract has been breached. *Kelly v. Marx,* 428 Mass. 877,
> 878, 705 N.E.2d 1114 (1999).

*Id.* at 420, 886 N.E.2d 673-74; *see also In re Nat'l Northway Ltd. P'ship*, 2002 WL

32397224 (Bankr. D. Mass. Dec. 20, 2002).

LBM's principal's own testimony evidences that the interest rates are unenforceable

penalties. Mallegni testified that one of the factors in setting the default interest rates was that

investors who participate in LBM's loans needed to be repaid. This statement is true of any loan.

That Mallegni consulted with William regarding an appropriate default rate does not render the

riskiness of the loan a basis for establishing the default rate. As William testified, the riskiness

of the loan was *already* factored into establishing the underlying contract rate: "The [contract] rate was set again based on the risk of a loan. . . . [W]ith respect to the default rate, [the] factors [were] . . . the *same* as the contract rate.  Again, it was based on the riskiness of the loan."  *See* Tr., Nov. 7, 2008, p. 69.

Although Mallegni testified that one of the costs of defaulted loans was his time spent working to collect them, he introduced absolutely no testimony to demonstrate how much, if any, time he spent collecting defaulted loans in the past and offered no analysis of how he determined that such a high default rate was necessary to cover anticipated collection costs with respect to these notes.  LBM's certified public accountant was capable of conducting an analysis of costs LBM incurs from defaulted loans, but LBM never asked him to do so.  *See supra* Section I. I. Mallegni was unable to recall what factors, if any, he reviewed to determine what LBM's damages were reasonably anticipated to be nor did he know how the default rates were intended to compensate LBM for any losses.  *See* Tr., Nov. 3, 2008, pp. 84, 115.  Mallegni admitted that he did not know how LBM arrived at the 41% default interest rates.  *See* Tr., Nov. 3, 2008, p. 116.  Thus, the Court can only conclude that the 41% default interest rates were not "reasonable forecast[s] of damages" that LBM expected to incur when its loans went into default.  *NPS, LLC*, 451 Mass. at 420.  Moreover, there was no evidence, nor was there a suggestion at trial, that LBM's damages "flowing" from defaulted loans "were difficult to ascertain."  *Id.*

LBM attempted to establish that its default interest rates were reasonable, in part, by introducing a note under which David, Robert, 201 Forest, and other affiliates lent $1,491,863.51 to an entity with which the Depietris were affiliated.  *See* Defs.' Ex. 31.  This note was only admitted for impeachment purposes, and there was no evidence or suggestion as to whether or not the default rate therein bore any relation to damages that were expected to flow from a

24

default.  *See* Tr. Nov. 5, 2008, pp. 99-100.  Accordingly, the Court does not find this note relevant or probative on the issue of whether LBM's default rates are enforceable.

Despite the fact that Mallegni believed LBM was harmed by the defaults because it would then be unable to make new loans, he failed to proffer any evidence that such lost opportunities actually existed.  *See* Tr., Nov. 3, 2008, pp. 118-119; 246-248.  That Mallegni "spoke" with other lenders about his default rates coupled with the fact that William had "seen" these types of default rates "many times" lacks substance and does not immunize LBM's default rates from the liquidated damages test.  *See* Tr., Nov. 3, 2008, p. 225; Tr., Nov. 7, 2008, p. 62. Lastly, Mallegni also testified that LBM considers the legal fees it incurs when setting the default rates.  *See* Tr., Nov. 3, 2008, p. 110.  However, the December and March Notes gave LBM the right to collect its attorney's fees in addition to the default rate and it sought to do just that when it filed the 219 Claim and the 201 Claim.  *See* Pls.' Agreed Exs. 16, 27, 42, 43.  In short, these default rates were simply a reflection of what Mallegni thought the traffic would bear and fail to satisfy either prong of the liquidated damages test.  Therefore, the Court concludes that the default interest rates are unenforceable penalties.

Pursuant to Massachusetts law, the Court has discretion to void the penalty clause and uphold the remainder of the contract.  The Court also may award the injured party his actual damages.  *A-Z Servicenter*, 334 Mass. at 675, 138 N.E.2d at 268.  In this case LBM is adequately compensated by the contract rate itself and LBM offered no testimony which would permit the Court to find otherwise.  Therefore the default rate will be eliminated in its entirety.  To the extent that 219 Forest has made payments to LBM on account of the default interest, 219 Forest may credit such payments against the amount of LBM's allowed claims.  The Court's conclusion that the default rates are unenforceable penalties is not to be construed as disallowing LBM's

contract rates of interest as the Plaintiffs did not satisfy their burden that such provisions were

penal or otherwise unenforceable under any theory.

The March and December Notes also provide that LBM may add all unpaid interest and

fees to the principal balance and calculate future interest payments on the new principal balance.

Although compounding interest provisions may be enforced if provided for in a contract, *see,*

*e.g., D'Annolfo v. D'Annolfo Constr. Co., Inc.*, 654 N.E.2d 82, 85 (Mass. App. Ct. 1995), in this

case they are a major component of the 41% default interest rates that the Court has found

unenforceable.  As such, the compounding interest provisions of the March and December Notes

take the form of a penalty and are likewise unenforceable.  *See In re Rolfe*, 25 B.R. 89, 94

(Bankr. D. Mass. 1982).

Finally, 219 Forest and 201 Forest assert that the late fees are unenforceable penalties.

The enforceability of a late fee provision is also analyzed under the liquidated damages test.  *See*

*Fleet Bank of Massachusetts, N.A.*, 1995 WL 389862, at *3 (invalidating 5% late fee).  The

Court has found that LBM presented no credible evidence of additional costs it incurs when

loans go into default.  Moreover, the non-LBM notes that 219 Forest was the borrower on did not

have late fees provisions in excess of 5%.  *See* Pls.' Agreed Exs. 6, 9.  LBM failed to meet its

burden of proof that a 10% late fee bore "any relationship to [its] actual damages."  *See Fleet*

*Bank of Massachusetts, N.A.*, 1995 WL 389862, at *3.  The Court believes that a 5% late fee,

however, is reasonable.  Consequently, the Court declares that the default interest provisions of

the March and December Notes are unenforceable, and LBM is entitled to collect a 5% late fee.

### B.    Count II: Declaratory Judgment as to Amount Owed on the December Note

219 Forest requests a declaratory judgment that the maturity date of the December Note

was extended or in the alternative, that LBM waived its right to receive the default rate of

interest.  219 Forest bears the burden to prove that the maturity date of the December Note was

extended by agreement.  *See Tudor Press, Inc. v. Univ. Distrib. Co.*, 198 N.E. 244, 245 (Mass.

1935) ("modification of existing liability, is an affirmative defense as to which the defendant has

the burden of proof."); *Pagounis v. Pendelton*, 753 N.E.2d 808, 811 (Mass. App. Ct. 2001)

("Whether the parties intended a novation was a factual question . . . [and the party] asserting it

as an affirmative defense, bore the burden of proof.").  219 Forest must show that LBM assented

to an extension of the December Note, and that the extension was supported by consideration.

*See Okerman v. VA Software Corp.*, 871 N.E.2d 1117, 1125 (Mass. App. Ct. 1992).

As previously explained, Norris sent a letter to 219 Forest stating that the December Note

would only be extended if he was released from his lease with 65 Boston Post Realty Trust.  *See

supra* Section I. J.  David never agreed to release Norris from his lease.  Although LBM's

conduct during these negotiations, which effectively put 219 Forest between the proverbial rock

and a hard place, was unscrupulous to say the least, and is discussed in greater detail *infra*

Section II. E. 2., the parties failed to mutually agree to the terms of the December Note

extension.  *See Samuels v. Brooks*, 519 N.E.2d 605, 609 (Mass. App. Ct. 1988) ("A contract may

be held to be nonexistent for failure of mutual assent.").  The extension was expressly

conditioned on Norris being released from his lease to which David and Robert could not, and

did not, agree.  As such, the Court concludes that the December Note was not extended.

219 Forest made monthly payments to LBM on account of the December Note from

December of 2003 through February of 2006 at the contract rate of interest.  219 Forest argues

that LBM effectively waived its right to receive the default interest by accepting these monthly

payments without protest and without reservation.  Conditions and clauses in contracts may be

waived "expressly or by words or conduct."  *McCarthy v. Tobin*, 706 N.E.2d 629, 632-33 (Mass.

1999); *Owen v. Kessler*, 778 N.E.2d 953, 957 (Mass. App. Ct. 2002).  The burden to prove

waiver rests on the party asserting it.  *DSF Investors, LLC v. Lyme Timber Co.*, 18 Mass. L. Rptr.

411, 2004 WL 3414427, at *12 (Super. Ct. 2004).  It is undisputed that LBM never explicitly

stated that it was waiving its contractual right to receive default interest under the December

Note.  As such, a finding of waiver would have to be implied by LBM's conduct.  When waiver

is not explicit, "it must be premised on 'clear, decisive and unequivocal conduct."  *KACT, Inc. v.

Rubin*, 819 N.E.2d 610, 616 (Mass. App. Ct. 2004) (citing *Glynn v. Gloucester*, 401 N.E.2d 886,

892 (Mass. App. Ct. 1980)).

Here, LBM accepted payments at the contract rate of interest for over two years after the

December Note matured, however, it did not remain silent about its intent to collect the default

interest.  Alden sent a letter to David stating that LBM would assess the default interest and sent

monthly statements which indicated that the default interest was accruing notwithstanding 219

Forest's payments at the contract rate of interest.  *See supra* Section I. J.  Although Robert could

not recall whether 219 Forest received the monthly statements, the Defendants' exhibit is

accompanied by fax confirmation sheets which indicate that the monthly statements were faxed

to Robert's fax number at Rosewood Management.  *Compare* Defs.' Ex. 19 *with* Pls.' Ex. V.  As

LBM put 219 Forest on notice that the default interest was accruing on the balance of the

December Note, LBM's "clear, decisive, and unequivocal conduct" was such that LBM did not

waive its right to receive the default interest.  *Cf. Porter v. Harrington*, 159 N.E. 530, 531 (Mass.

1928) (finding waiver because defendant accepted late payments for many years and did not give

"notice  . . . of [his] intention . . . to hold the plaintiff in the future to a more strict compliance.").

Consequently, the Court will enter judgment declaring that the December Note was not

extended and that LBM did not waive its right to collect the default interest.  This conclusion,

however, does not impact the Court's decision that the default rates of interest are unenforceable

penalties in any event, and therefore not payable by 219 Forest or 201 Forest.

### C.   Count IV: Declaratory Judgment as to Amount Owed on the March Note

219 Forest requests a declaratory judgment as to the amount owed on the March Note,

alleging that LBM failed to account for $202,271.30 in payments.  The only evidence that 219

Forest presented at trial relating to this allegation was the $32,459.11 payment that LBM

received from the Cranston Commons Assignment on June 17, 2002.  The Court was unable to

identify any other payments that LBM may have misapplied or not properly credited. Seventy-

one exhibits were admitted into evidence at trial; it is not the Court's duty "to sift through

multifarious documents and testimony to congregate those facts which are necessary to establish

a party's action or defense."  *In re Bell & Beckwith*, 64 B.R. 620, 635 (Bankr. N.D. Ohio 1986).

Rather, it is the duty of the litigants to present their evidence in a logical manner that leads "to

the conclusion sought."  *Id.*  219 Forest bears the burden to prove that the $32,459.11 payment

should have been applied to the March Note.  *Cf. R.T. Adams Co. v. Israel*, 138 N.E. 319, 320

(Mass. 1923) (stating that "[t]he burden of proof rested upon the defendant to show that he made

payments to one authorized to receive them.").

There is no dispute that LBM received the $32,459.11 payment on June 17, 2002, but

LBM argues that it was not required to apply it to the March Note.  LBM cites to *Warren Bros.*

*Co. v. Sentry Ins.*, 433 N.E.2d 1253, 1255 (Mass. App. Ct. 1982), for the proposition that a

creditor is free to apply a debtor's payment to any of the debtor's obligations "as he chooses and

without concern for the debtor's interests" if the debtor fails to instruct the creditor to apply the

payment to a specific obligation.

LBM's reliance on *Warren Bros.* is misplaced for two reasons.  First, while Robert and David may have been obligated on the loans that the $32,459.11 payment was purportedly transferred to (a fact <u>not</u> in evidence), there is no evidence that 219 Forest or Cranston Commons was so obligated.  Consequently, *Warren Bros.* did not provide LBM with a license to freely apply the $32,459.11 payment to these loans as they were not 219 Forest's or Cranston Commons' obligations.  Second, and more importantly, the parties executed an agreement which provided that the Cranston Commons reimbursements were assigned "[t]o secure the payment" of the money lent by LBM under the March Note and Robert's and William's testimony corroborated this agreement, *see supra* Section I. F; Tr., Nov. 5, 2008, pp. 144-145, as does LBM's behavior of applying all of the Cranston Commons reimbursements to the March Note with the exception of the $32,459.11 payment.  *See Lodge Corp. v. Assurance Co. of Am.*, 775 N.E.2d 1250, 1253 (Mass. App. Ct. 2002) (citing RESTATEMENT (SECOND) OF CONTRACTS § 202 "Where an agreement involves repeated occasions for performance by either party . . . any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.")).  No evidence was proffered by LBM that any other agreement with respect to application of these payments existed.  As the parties had an agreement that the Cranston Commons reimbursements were to be applied to the March Note, LBM was *not* free to apply the reimbursements to other obligations "as [it chose] and without concern for [219 Forest's] interests."  *Warren Bros. Co.*, 433 N.E.2d at 1255.

Alden's testimony that "someone" instructed her to re-apply the $32,459.11 payment to four other loans was not reliable.  *See supra* Section I. F.  First, Alden could not recall who gave her this instruction.  At trial she testified that it was "probably" Robert who instructed her to re-apply the payment, but at her deposition she could not recall who gave her the instruction.  *See*

30

Tr., Nov. 4, 2008, pp. 67-68.  Second, Alden could not remember *when* she received the

instruction, or whether she received the instruction in writing or in a phone call.  *See id.* pp. 68-

69.  Even if the Court were to believe that "someone" on behalf of 219 Forest had instructed

Alden to re-apply the payment, which it does not, not only did the re-application contravene the

agreement between 219 Forest and LBM, it also breached the rights of William, a 50%

participant in the March Note.  William testified that the Cranston Commons payments were to

be applied to the March Note and that he never gave LBM permission to re-apply the payment to

other loans, nor was he even asked.  *See* Tr., Nov. 7, 2008, pp. 71-74.  William was effectively

deprived of his share of the $32,459.11 payment because he was not a participant (as far as this

record shows) in the loans to which LBM claims the payment was re-applied.  *See id.* p. 71.

The Court does not accord any weight to the notations on the copy of the $32,459.11

check that to purport to represent that $17,340.42 was applied to loan # 295, $7,751.55 was

applied to loan # 509, $2,694.46 was applied to loan # 515, and $4,672.68 was applied to loan #

582.  *See* Defs.' Ex. 11; *see, e.g.*, *In re Durastone Co., Inc.*, 223 B.R. 396, 402 (Bankr. D.R.I

1998) (according little weight to invoices).  Other than the notations on the check, LBM did not

introduce any documentation to substantiate its assertion that the $32,459.11 payment was re-

applied to these four other loans.  The Court cannot ignore the fact that the copy of the

$32,459.11 check (Defs.' Ex. 11) suddenly emerged on the eve of trial, but was not produced

during discovery when 219 Forest was seeking an explanation as to what happened to the

$32,459.11 payment.[21]  As ledgers for these "loans" were not admitted in evidence and a copy of

the check only appeared at the eleventh hour, the Court has no way of knowing whether the

$32,459.11 payment was *actually* reapplied to these loans.

---

[21] Alden testified that she knew the copy of the check existed; there was no reasonable explanation of why it was not
produced in response to the Plaintiffs' request for production of documents.  *See infra* Section IV.

As the Court has found that LBM was required to apply the $32,459.11 payment to the
March Note, and re-application of said payment to other loans was not authorized, judgment will
enter for 219 Forest re-applying the $32,459.11 payment to the March Note as of June 17, 2002
and requiring the adjustment of the principal due and adjustment of interest charges thereafter.

### D.    Count V: Equitable Subordination

219 Forest requests the equitable subordination of LBM's claims to those of its unsecured
creditors.  Section 510(c) of the Bankruptcy Code provides that bankruptcy courts may "under
the principles of equitable subordination, subordinate for purposes of distribution all or part of an
allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or
part of another allowed interest."  Bankruptcy courts may apply §510(c) to subordinate a claim
when the following three elements are present: "(1) the subordinated creditor has engaged in
some type of inequitable conduct; (2) such conduct resulted in injury to other creditors or
conferred an unfair advantage on the subordinated creditor; and (3) equitable subordination is not
inconsistent with the provisions of the Bankruptcy Act."  *In re Bellucci*, 29 B.R. 814, 815
(B.A.P. 1st Cir. 1983) (citing *In re Mobile Steel*, 563 F.2d 692, 699-700 (5th Cir. 1977)).  The
party seeking to equitably subordinate a creditor's claim must prove the three prongs by a
preponderance of the evidence.  *See, e.g.*, *In re Morse Tool, Inc.*, 148 B.R. 97, 141 (Bankr. D.
Mass. 1992).  The creditor must have "engaged in inequitable conduct; an inequitable result is
not enough on its own."  *In re Sheperds Hill Dev. Co., LLC.*, 2000 WL 33679427, at *5 (citing
*United States v. Noland*, 517 U.S. 535, 539 (1996)).  The goal of the doctrine of equitable
subordination is solely remedial, and is not intended to punish offending creditors.  *In re Mayo*,
112 B.R. 607, 650 (Bankr. D. Vt. 1990).

The presence of inequitable conduct alone is not sufficient, as the second prong requires

the bankruptcy court to identify how the inequitable conduct affected or was unfair to other

creditors.  *See In Giorgio*, 862 F.2d 933, 939 (1st Cir. 1988) (refusing to equitably subordinate

claim because "the record reveals no particular inequity vis-a-vis other creditors . . . the record

does not reveal . . . how, if at all, Pasco's conduct might have been unfair to them."); *In re 604*

*Columbus Ave. Realty Trust*, 968 F.2d 1332, 1363 (1st Cir. 1992) ("[D]epletion of the funds

available for construction, and its attendant impact on the success of the Trust's renovation

efforts, was a sufficiently concrete *harm* to the Trust's *other creditors* to warrant equitable

subordination of the Bank."); *In re Terrific Seafoods, Inc.*, 197 B.R. 724, 735 (Bankr. D. Mass.

1996) (refusing to equitably subordinate claim because there was no "*causation*" between the

innocent creditors' losses and the offending creditor's misconduct).  The third prong is satisfied

so long as the bankruptcy court does not "ignore[e] the language of the bankruptcy laws in the

name of equity."  *See In re Racing Servs., Inc.*, 340 B.R. 73, 78 (B.A.P. 8th Cir. 2006).

     1.    *Inequitable Conduct*

The level of scrutiny applied to the first prong is dependent upon whether or not the

offending creditor is an insider of the debtor.  *In re 604 Columbus Ave. Realty Trust*, 968 F.2d at

1360.  To equitably subordinate the claims of a non-insider, its conduct must be "egregious and

severely unfair in relation to other creditors."  *See In re Giorgio*, 862 F.2d at 939.  The conduct

of an insider is more "rigorously scrutinized" under the first prong.  *In re Envid. Inc.*, 345 B.R.

425, 455 (Bankr. D. Mass. 2006).  When the debtor is a corporation, the Bankruptcy Code

defines an "insider" as, *inter alia*, an "affiliate" of the debtor.  11 U.S.C. § 101(31)(E).  The

Bankruptcy Code defines an "affiliate" as, *inter alia*, an "entity that directly or indirectly owns,

controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of

the debtor . . . ."  11 U.S.C. § 101(2)(A).  The Court finds that LBM is an insider of 219 Forest

by virtue of the fact that its 96% owner and manager, Mallegni, acting on behalf of Wolfpen, has

the power to veto any of 219 Forest's prospective financing transactions.  This finding, however,

is not essential to the Court's ultimate conclusion as LBM's conduct satisfies the more

"egregious" non-insider standard.  *See Shubert v. Lucent Techs., Inc (In re Winstar Commc'ns,

Inc.)*, 348 B.R. 234, 284 (Bankr. D. Del. 2005) ("whether Lucent is an insider does not affect the

Court's conclusion that the first prong  . . . is satisfied.").

 The Court first revisits the closing of the December Note.  *See supra* Section I. H.

Mallegni's statement that Commerce wanted and needed to be paid off before the end of the year

was a misrepresentation because Mallegni, rather than Commerce, owned Commerce Note at the

time of the closing.  *See supra* Section I. H; Tr., Nov. 5, 2008, pp. 151-152.[22].

 Mallegni testified that he purchased the Commerce Note and subsequently refinanced it

with the December Note as a favor to his friend Robert, who had asked him to do so.  *See* Tr.,

Nov. 3, 2008, pp. 90-95 ("Bob Depietri asked me to help him out and that's what we did. . . . he

told me to buy the loan . . . Bobby is my friend [and] I did what Bobby asked me to do.").

Robert testified that he did not know Mallegni purchased the Commerce Note when Mallegni

offered to refinance it with a loan through LBM.  *See* Tr., Nov. 5, 2008, pp. 150-151.  The Court

does not find Mallegni's testimony credible particularly as the terms of the December Note were

much less favorable to 219 Forest, but much more favorable to LBM when compared to the

terms of the Commerce Note then held by Mallegni:

---

[22] The Court imputes Mallegni's conduct to LBM as the Court finds that Mallegni, as 96% owner of LBM, was
acting on behalf of and for the benefit of LBM (and also for his own benefit) by arranging the refinance of the
Commerce Note.  *Cf. New England Trust Co. v. Farr*, 57 F.2d 103, 111 (1st Cir. 1932) (when agent is acting on
behalf of principal, his fraudulent acts are imputed to his principal unless the agent was acting solely for his own
benefit) *see also In re Rowlands*, BAP No. 08-047, pp. 9-11 (B.A.P. 1st Cir. Dec. 30, 2008) (imputing principal's
failure to act to his entity because of the "degree" and "level of control" he had over the entity).

|  | **Commerce Note** | **December Note** |
|---|---|---|
| *Contract Rate* | Corporate Base Rate + 2.5% | 14% |
| *Default Rate* | Contract Rate + 4% | Contract Rate + 6% + one point per month |
| *Late Fees* | 5% of the overdue amount | 10% of the overdue amount |
| *Collateral* | The 219 Forest Property | The 219 Forest Property <u>and</u> the 201 Forest Property |

*See* Pls.' Agreed Exs. 9, 27, 32.  In addition, LBM acquired additional collateral when it refinanced the Commerce Note by demanding that 201 Forest guaranty the December Note and grant a mortgage on the 201 Forest Property.  *See supra* Section I. H.[23]  Mallegni's misrepresentation was inequitable because it lured 219 Forest into signing the December Note under the false impression that foreclosure of the Commerce Note was imminent which led 219 Forest to believe that there was no time to seek alternative refinancing.  *Cf. In re Ambassador Riverside Investment Group*, 62 B.R. 147, 153-54 (Bankr. M.D. La. 1986) (finding inequitable conduct where lender's agent misled investors into believing that a takeout/renovation loan was forthcoming).

When this misrepresentation was made, Mallegni could have received the remaining 60% of 219 Forest pursuant to the March Agreement.  *See supra* Section I. E.  Mallegni did not elect to exercise this bargained for right because he apparently perceived that the alternative course of a refinance with LBM (and payment of the prior Commerce loan he held personally) would generate more value.  Instead of becoming the effective 100% owner (60% Mallegni and 40% Wolfpen) of 219 Forest and its undeveloped land, the misrepresentation paved the way for

---

[23] The Court has recently determined that the mortgage on the 201 Forest Property has been discharged by operation of M.G.L. ch. 260, § 33.  *See generally In re 201Forest Street, LLC*, 404 B.R. 6 (Bankr. D. Mass. 2009).

Mallegni to put 219 Forest into a loan with suffocating terms *and* obtain a valuable piece of

collateral from 201 Forest that would also be available to foreclose on when the consequences of

the suffocating terms came to fruition.

Next, the Court turns to the negotiations to extend the term of the December Note.  *See*

*supra* Section I. J.  At some point during the negotiations, Mallegni authorized Norris to

condition the extension on the release of Norris from his lease, a $600,000 obligation, that Norris

had with 65 Boston Post Realty Trust, an entity in which 219 Forest has no interest and is, at

most, only indirectly affiliated.  Unrelated third parties owned the majority of 65 Boston Post

Realty Trust's real estate.  *See* Tr., Nov. 5, 2008, p. 175.

Norris testified that Mallegni approached him and asked him to become a tenant in a

building that Mallegni was going to purchase on Locke Drive in Marlborough because they were

having regular, frequent meetings and being across town from his attorney was too inconvenient.

*See* Tr., Nov. 5, 2008, p. 42.  Norris testified that he told Mallegni that he could not become a

tenant in the building unless he was released from the six or seven years remaining on his lease

at 65 Boston Post Realty Trust.  *See id.* p. 43.  Norris testified that Mallegni told him that he had

spoken with the Depietris who agreed to a release.  *See id.* p. 44.  Norris testified that Mallegni

authorized him to send a letter on January 30, 2004 which stated that the extension was

conditioned on the release because it was one of the things they "were trying to clean up" up in

conjunction with the extension.  *See* Pls. Ex. X; Tr., Nov. 5, 2008, pp. 46-52.

Meanwhile, Mallegni denied ever giving Norris such authorization and testified that he

had no idea that Norris was attempting to procure a release as part of the extension.  *See* Tr.,

Nov. 3, 2008, pp. 127-129; 209.  At one brief point during his testimony, however, Mallegni

seemed to acknowledge that he did know that Norris was seeking the lease release in conjunction

with the extension. *See* Tr., Nov. 3, 2008, pp. 132-133. The Court does not credit Mallegni's

testimony on this topic partially because LBM admittedly continues to use Norris's services. *See*

Tr., Nov. 3, 2008, p. 243. The Court cannot accept that LBM would continue to use Norris's

legal services if he had been conditioning LBM's transactions on extraneous terms without

authorization. Furthermore, the Court does not credit Mallegni's denial of his involvement in

conditioning the extension on the lease release since he enjoys the benefit of having Norris in the

same building with him and, presumably, the benefit of collecting rent from Norris. Finally, the

Court does not believe that Mallegni was left in the dark about the lease release issue in light of

the fact Mallegni is listed as a "c.c." on the first letter that raises the lease release, and Norris

testified that he customarily sends copies of letters to persons listed as such. *See* Pls. Agreed Ex.

W; Tr., Nov. 5, 2008, pp. 45-46.[24] There was no testimony that would lead the Court to believe

that Norris would deviate from this customary practice on this occasion. LBM's refusal to

extend the December Note unless Norris was released from a $600,000 lease obligation that he

had with an entity that 219 Forest had no interest in was overreaching and satisfies the first prong

of the equitable subordination test.

In its proposed findings of fact and conclusions of law, 219 Forest relies on, *inter alia*, its

allegation that Mallegni inflated payoff figures for the Wolfpen and August Notes. More

specifically, 219 Forest alleges that Mallegni improperly added a $100,000 exit fee to the August

Note payoff figure. Although this conduct took place in September of 1999, there is no statute of

limitations with respect to equitable subordination actions. *See In re Emergency Monitoring

Techs., Inc.*, 366 B.R. 476, 510 (Bankr. W.D. Pa. 2007); *In re Sw. Supermkts., LLC*, 325 B.R.

417, 427 (Bankr. D. Ariz. 2005). The payoff figures were provided by Mallegni acting on behalf

---

[24] Norris also testified that it would have been his normal and customary practice to instruct his secretary to send a
copy of the January 30, 2004 letter (Pls.' Ex. X) to Mallegni. *See* Transcript, Nov. 5, 2008, pp. 55-57.

of Wolfpen, the holder of the notes.  As such, the Court would have to pierce Wolfpen's

corporate veil and essentially find that Wolfpen and LBM are the same entity in order to impute

this conduct to LBM.  *See In re Plantation Realty Trust*, 232 B.R. 279, 282 (D. Mass. 1999)

(explaining that the corporate veil may be pierced to "imput[e] . . . liability among differing

corporate entities."); *In re Aoki*, 323 B.R. 803, 811-812 (B.A.P. 1st Cir. 2005) ("piercing the

corporate veil in appropriate [when] . . . there is a confused intermingling of activity of two or

more corporations engaged in a common enterprise with substantial disregard of the separate

nature of the corporate entities, or serious ambiguity about the manner and capacity in which the

various corporations and their respective representatives are acting." (quoting *My Bread Baking

Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748, 752 (Mass. 1968) ("*My Bread*"))). Adopting

the *My Bread* standard, the First Circuit set forth twelve factors to consider when determining

whether to pierce the corporate veil:

> (1) common ownership;
> (2) pervasive control;
> (3) confused intermingling of business activity, assets, or
> management;
> (4) thin capitalization;
> (5) nonobservance of corporate formalities;
> (6) absence of corporate records;
> (7) no payment of dividends;
> (8) insolvency at the time of the litigated transaction;
> (9) siphoning away of corporate assets by the dominant
> shareholders;
> (10) nonfunctioning of officers and directors;
> (11) use of the corporation for transactions of the dominant
> shareholders; and
> (12) use of the corporation in promoting fraud.

*Pepsi-Cola Metro. Bottling Co., Inc. v.* 754 F.2d 10, 16 (1st Cir. 1985); *Evans v. Multicon
Constr. Corp.*, 574 N.E.2d 395, 398 (Mass. App. Ct. 1991) (applying the *Pepsi-Cola* factors).

Although there was no evidence of factors four through ten, the evidence on the

remaining factors was robust.  There was common ownership among the two entities as Mallegni

38

owned 50% of Wolfpen and 96% of LBM.  In reality, Mallegni acted as if he were the 100%

owner of Wolfpen as William was a "silent partner" that had no apparent involvement in

Wolfpen's day to day operations and amazingly no knowledge of Wolfpen's 40% ownership

interest in brother David's entity, 219 Forest.  Moreover, Robert and David did not seem to know

that William owned 50% of Wolfpen.  *See* Tr., Nov. 5, 2008, pp. 109-110; Tr., Nov. 7, 2008, pp.

65, 78, 80.  Mallegni had unrestrained control over both Wolfpen and LBM.  On at least one

occasion, Mallegni utilized his control over Wolfpen for the benefit of LBM when he threatened

to exercise Wolfpen's veto power if 219 Forest did not agree to the $907,518 payoff figure for

the Wolfpen Note.  This threat benefitted LBM because 219 Forest borrowed from LBM to

satisfy a portion of that figure.  *See supra* Section I. E.  Mallegni's control over Wolfpen and

LBM was omnipresent: he used Wolfpen's veto power to block the First Essex financing, he

made substantial loans to 219 Forest through LBM, he attempted to add the lease release as a

condition to an extension of one of LBM's loans, and he refused to provide 219 Forest with

payoff figures for the LBM loans.  Mallegni proudly testified that it was he, and only he, that

made all of LBM's major business decisions, and Mallegni solely negotiated the loans that

Wolfpen made to 219 Forest.  *See* Tr., Nov. 3, 2008, p. 56; Tr., Nov. 7, 2008, pp. 65.

       There was also confused intermingling of business activity and management as it was

often unclear as to whether Mallegni was acting on behalf of Wolfpen, LBM, or Wolfpen's 40%

interest in 219 Forest.  Mallegni treated himself, Wolfpen, and LBM as mere components of a

single enterprise, rather than three distinct entities.  He blatantly disregarded the fact that actions

he took for the benefit of either LBM or Wolfpen worked to the detriment of another entity that

he partially owned, 219 Forest.  As Mallegni felt that it was appropriate to treat the entities as a

single enterprise, the Court will do so as well in analyzing whether it is appropriate to impute

Wolfpen's conduct to LBM.  Furthermore, LBM appears to be a mere continuation of Wolfpen as it carries on the exact same type of business, it is controlled by the same person, it uses the same employees (Kozik and Alden), and it uses the same counsel.  The only distinction between the two entities is that LBM does not have the "silent partner" that Wolfpen had.  This distinction is meaningless for the Court's analysis.

Lastly, Mallegni utilized LBM as the instrumentality for the December Note that was entered into under false pretenses.  Given the common ownership, the pervasive control, the blending of the entities, and the use of LBM as an instrumentality to carry out Mallegni's schemes, it is appropriate to treat Wolfpen, LBM, and Mallegni as a single entity and attribute the conduct of each to all.

219 Forest has the burden to show that the amounts claimed to be owed on the August and Wolfpen Notes were inaccurate.  *Cf. Cmty. Builders, Inc. v. Indian Motorcycle Assocs., Inc.*, 692 N.E.2d 964, 975 (Mass. App. Ct. 1998) ("Payment is a matter of affirmative defense . . . and the burden lay with the defendants.").  The original principal balance on the Wolfpen Note was $734,688.10, but approximately $907,518 was claimed as owed when it was refinanced.  *See supra* Section I. E.  Robert conceded that he did not know whether the Wolfpen Note was current when it was refinanced and the ledger for the Wolfpen Note, the accuracy of which was not challenged by 219 Forest, indicates that 219 Forest failed to make payments from June of 2000 until it was refinanced with Commerce on March 20, 2001 resulting in the assessment of default interest[25] and a principal balance in excess of $900,000.  *See* Defs.' Ex. 5; *supra* Section I. E.  As such, 219 Forest did not prove that the $907,518 figure was inaccurate.

The $1,311,015.00 payoff figure for the August Note, however, is unintelligible.  *See* Defs.' Ex. 6; *supra* Section I. D.  Robert's testimony that 219 Forest had paid the fee to extend

---

[25] The enforceability of the Wolfpen Note's default rate of interest is not at issue.

the August Note and was current with its payments when the August Note was refinanced with

Wolfpen and Hudson was not contradicted at trial.  In fact, Wolfpen's own ledger corroborates

Robert's testimony.  It indicates that 219 Forest made an $18,000 payment (half of the 3%

extension fee) in addition to its regular monthly payment on February 4, 1999 and that 219

Forest was current on September 1, 1999 owing $600,000 (half of the principal balance which

was Wolfpen's share of the August Note).  *See* Defs.' Ex. 5.  Moreover, Wolfpen's ledger lists a

$50,000 payment that the Court finds is half of the exit fee.  Apparently, Clinton Management

maintained a separate ledger for the other half of the $1,200,000 loan.[26]

Robert testified that 219 Forest had an agreement with Wolfpen that entitled Wolfpen to

acquire a 40% interest in 219 Forest *or* be paid a $100,000 exit fee upon maturity of the August

Note.  The Court believes that there was such an agreement as Mallegni's testimony that the 40%

interest was a "gift" is not credible.  Robert testified that the payoff figure was $1,311,015.00

because Wolfpen improperly demanded and received *both* the 40% interest and the $100,000 exit

fee.  *See* Tr., Nov. 5, 2008, pp. 110, 113-117; *supra* Section I. D.  Based on the record before the

Court, Robert's testimony provides the only plausible explanation of how the payoff figure came

to be $1,311,015.00.  Mallegni did not deny the allegation that the $100,000 exit fee was added.

*See* Tr., Nov. 3, 2008, p. 68 ("I don't know. I'd have to discuss it with Mr. Depietri.").

Mallegni's testimony that the payoff figure includes closing costs sheds no light on how it

became $1,311,015.00 as Hudson and Wolfpen's closing costs are separately accounted for and

added in *after* the $1,311,015.00 figure.  *See supra* Section I. D; *see* Defs.' Ex. 6.  Having

Robert's testimony and Wolfpen's unorthodox ledger as the only credible evidence of how the

payoff figure became $1,311,015.00, the Court concludes that Wolfpen tacked on at least an

---

[26] It was unusual and confusing for Wolfpen and Clinton Management, as joint payees of the August Note, to administer the loan and record payments on separate ledgers.  The ledger for the other "half" of the loan was not offered into evidence.

additional $50,000, to which it was not entitled, to the payoff figure of the August Note.[27]

Mallegni and LBM's extraction of this undeserved and substantial sum of money from 219

Forest was unquestionably inequitable.

      2.     *Harm to 219 Forest's Creditors or Unfair Advantage to LBM*

Next, the Court must determine whether Wolfpen and LBM's conduct harmed 219

Forest's other creditors or conferred an unfair advantage on LBM.  *In re Bellucci*, 29 B.R. at 815.

The Court does not need to spend a great deal of time evaluating this prong of the equitable

subordination test.  The misrepresentation at the closing of the December Note gave LBM an

unfair advantage over other creditors because it enabled LBM to obtain a mortgage on the 201

Forest Property and thereby leap ahead of 201 Forest's unsecured creditors.  Had 201 Forest

sought the equitable subordination of the 201 Forest, this would have been sufficient harm to 201

Forest's creditors.

Turning to harm to 219 Forest's creditors, the improper addition of at least $50,000 to the

balance of the August Note on September 1, 1999 has accrued interest and late charges that the

Court can not even begin to calculate.  Mallegni's refusal to consent to the apparently reasonable

First Essex financing in 2002 caused additional interest to accrue on the March Note.  Moreover,

Mallegni's refusal to extend the December Note absent the release of its attorney from a

substantial lease obligation that 219 Forest had no authority over resulted in assessment of over

$376,757.91 in default interest.  *See infra* Section II. E. 2.  An untold, but nonetheless staggering,

amount of additional interest has since accrued on that figure.  Finally, LBM's refusal to provide

219 Forest with payoff figures in 2005 ensured that default interest, at a rate of 41%, would

continue to accrue on the March and December Notes.  In short, LBM's inequitable conduct

---

[27] For the purposes of equitable subordination, it is not necessary to determine whether the wrongfully assessed exit fee was in the amount of $50,000 or $100,000.

drastically amplified its claims leaving nothing for 219 Forest's unsecured creditors. *Cf. In re 604 Columbus*, 968 F.2d at 1337-39 (holding that the lender's "excess withdrawal of soft costs" warranted the equitable subordination of the lender's claim because "the depletion of the funds available for construction, and its attendant impact on the Trust's renovation efforts, was a sufficiently concrete harm to the Trust's other creditors . . . ."). Consequently, the Court concludes that Wolfpen and LBM's pattern of inequitable conduct has harmed 219 Forest's other creditors[28] and has conferred an unfair advantage upon LBM.

Finally, subordinating LBM's claims is not inconsistent with the Bankruptcy Code. Accordingly, judgment will enter subordinating LBM's allowed claim to all of 219 Forest's unsecured creditors. This may require some return of payments to 219 Forest that LBM received from the sale of the 219 Forest Property.

## E.    Counts VI, X, & XII: Unfair and Deceptive Acts and Practices (M.G.L. ch. 93A)

219 Forest seeks to recover damages from LBM and Mallegni for their alleged violations of M.G.L. ch. 93A ("93A"). To recover under 93A, a plaintiff must show that the defendant engaged in "unfair or deceptive acts or practices in the conduct of [its] trade or commerce." M.G.L. ch. 93A, § 2. An act is unfair or deceptive under 93A if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Heller Fin. v. Ins. Co. of N. Am.*, 410 Mass. 400, 408 (1991). Violations of 93A need not be premised on violations of independent common law or statutory duties. *See Mass. Farm*

---

[28] Although there was no quantification of the harm to 219 Forest's other creditors, such evidence is not required. *See In re 604 Columbus Ave Realty Trust*, 968 F.2d at 1363 ("In demonstrating the harm, the objecting party usually need not identify specifically each particular creditor who was harmed and quantify the injury suffered by each."); *see also In re Winstar Comms., Inc.*, 554 F.3d 382, 413 (3d Cir. 2009) ("quantification [of harm] may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer." (quoting *Citicorp Venture Capital, Ltd. v. Comm. Of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998))).

*Bureau Fed., Inc. v. Blue Cross of Mass., Inc.*, 403 Mass. 722, 729 (1989).  When both the

injured party and the offending party were engaged in trade or commerce, the injured party must

show that "[t]he objectionable conduct attain[ed] a level of rascality that would *raise an eyebrow*

of someone injured to the *rough and tumble* of the world of commerce" to recover under 93A.

*Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979).  "A misrepresentation in

the common law sense," can be actionable under 93A, *id.*, and the plaintiff is not required to

show that the misrepresentation was intentional as even a *negligent* misrepresentation that is so

"extreme or egregious" may be sufficient.  *See Marram v. Kobrick Offshore Fund, Ltd.*, 442

Mass. 43, 62 (2004).

     An act or practice is deceptive "if it could reasonably be found to have caused a person to

act differently from the way he otherwise would have acted."  *Lowell Gas Co. v. Attorney*

*General*, 377 Mass. 37, 51 (1979).  "In determining whether an act or practice is unfair, as

opposed to deceptive, [the court] must evaluate the equities between the parties. What a

defendant knew or should have known may be relevant in determining unfairness.  Similarly, a

plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in

determining whether an act or practice is unfair." *Swanson v. Bankers Life Co.,* 389 Mass. 345,

349 (1983).  An act may be unfair between businesses under 93A without being "deceptive or

fraudulent."  *Mass. Farm Bureau Fed., Inc.*, 403 Mass. at 729.

     As both the Plaintiffs and the Defendants in this case were engaged in trade or commerce,

the Plaintiffs must show that they suffered actual loss of money or property as a result of unfair

or deceptive acts.  *Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc.*, 645 N.E.2d 1165, 1170

(Mass. 1995); *Bowers v. Baystate Techs., Inc.*, 101 F. Supp.2d 53, 54 (D. Mass. 2000).  If the

Court finds that the defendant's conduct violated 93A, the plaintiff shall "be awarded reasonable

attorney's fees and costs incurred in said action." M.G.L. ch. 93A, § 11. If the Court finds that

"the [defendant's] use or employment of the . . . act or practice was a willful or knowing

violation," of 93A the court shall award "up to three, but not less than two times" the amount of

the plaintiff's actual damages. M.G.L. ch. 93A, § 11. The multiple damages provision of 93A is

"designed to impose a penalty . . . that varies with the culpability of the defendant." *Int'l Fidelity*

*Ins. Co. v. Wilson*, 387 Mass. 841, 856 (1983).

As the parties do not dispute the fact that the transactions and conduct at issue in this case

took place in a commercial context, the Court is not required to analyze the issue of whether 93A

applies. *See, e.g.*, *Begelfer*, 381 Mass. at 191 (1980) (listing the factors that must be considered

to determine whether a transaction took place in a commercial context). This leaves the Court to

determine 1) whether the Mallegni and LBM engaged in unfair or deceptive acts or practices, 2)

whether the Plaintiffs have suffered a loss of money or property as a result of unfair or deceptive

acts or practices, and 3) whether any unfair or deceptive acts or practices were willful or

knowing violations of 93A requiring the Court to award multiple damages.

Before making these determinations, however, the Court must first address the statute of

limitations. The statute of limitations for a 93A claim is four years. M.G.L. ch. 260, § 5A. In

their proposed findings of fact and conclusions of law the Plaintiffs point to several events that,

even if true, took place outside the four-year statute of limitations. First, 219 Forest points to

Mallegni's use of threats designed to extract both a $100,000 exit fee and a 40% interest in 219

Forest when the August Note was refinanced and Mallegni's fabrication of the amount

purportedly owed on the Wolfpen Note when it was refinanced with Commerce. These actions

allegedly took place in September of 1999 and March of 2001 and are thus outside 93A's four-

year statute of limitations. 219 Forest also points to Mallegni's refusal to agree to refinance the

Commerce Note with First Essex.  This allegedly took place sometime between March and May

of 2002 and is also outside the four-year statute of limitations of 93A.  As such, these allegations

cannot form the basis of the Plaintiffs' 93A claims.

At trial, the Plaintiffs argued that the Defendants' conduct that took place outside the

four-year statute of limitations can be considered because the Defendants engaged in a "course of

conduct which continued over a number of years" that only ceased upon the bankruptcy filing.

*See* Tr., Nov. 7, 2008, p. 43.  The Court is not aware of any jurisprudence standing for the

proposition that the statute of limitations for 93A claims is tolled when the offending party

engaged in a continuing course of conduct.  The Supreme Judicial Court has tolled the statute of

limitations in a tort action based upon the rationale that there was a continuing nuisance or a

continuing trespass.  *Sixty-Eight Devonshire, Inc. v. Shapiro*, 348 Mass. 177, 183-84 (1964).

The Court could find no precedent extending this doctrine to 93A claims, nor have the Plaintiffs

provided the Court with any.  Moreover, the Court also notes that the facts of *Shapiro* are quite

distinct as the defendant in that case was alleged to have committed one continuous wrong—

maintaining a defective gutter— which caused the same injury over a number of years.  Here, the

Defendants are alleged to have committed several *different* improper acts such as

misrepresenting facts, inflating payoff figures, and attempting to extort a lease release.  Given

the absence of precedent and the significant difference between the instant facts and *Shapiro*, the

Court does not accept the Plaintiffs' argument that the statute of limitations was tolled.

1.    *The December Note Closing*

Mallegni misrepresented Commerce's need to be repaid at the closing.  *See supra*

Sections I. H., II. D. 1.  It is well settled that misrepresentations are actionable under 93A and

that the plaintiff does not need to show that the misrepresentation was intentional, although it

would be hard (if not impossible) to imagine how the misrepresentation here could be anything but "intentional." *See Marram*, 442 Mass. at 62.  Mallegni's non-disclosure of his ownership of the Commerce Note rendered his statement that Commerce wanted to be paid incomplete and misleading.  *Winter Panel Corp. v. Reichhold Chems., Inc.*, 823 F. Supp. 963, 975 (D. Mass. 1993).  Although Robert knew that Mallegni had executed the repurchase agreement, he had no knowledge that Mallegni had *performed* under the agreement.  *See* Tr. Nov. 5, 2008, p. 151. Robert's belief that Commerce held the Commerce Note was reasonable as Mallegni did not exercise his right under the March Agreement to receive the remaining 60% of 219 Forest.  *See* Tr. Nov. 5, 2008, p. 148.  Finally, there was apparently no notice to the world of Mallegni's repurchase of the Commerce Note as there was no evidence presented that any of the instruments associated with the repurchase were recorded.  *See* Pls.' Agreed Exs. 23-25.  Therefore, Robert had no reason to disbelieve Mallegni's representation that Commerce needed to be repaid.

The Court finds that this misrepresentation caused the plaintiffs to "act differently from the way [they] otherwise would have acted," *Lowell Gas Co.*, 377 Mass. at 51, because the evidence demonstrated that 219 Forest had no plans to refinance the Commerce Note with LBM prior to Mallegni's misrepresentation.  In fact, 219 Forest had sought to refinance its loans with lenders other than LBM on at least two other occasions.  *See supra* Sections I. G., I. K. Although the Court does not need to find that Mallegni intended to deceive 219 Forest into refinancing with LBM, *see, e.g.*, *Aspinall v. Phillip Morris Cos., Inc.*, 442 Mass. 381, 394 (2004), the Court infers that Mallegni acted with such intent given the lender-friendly terms of the December Note, as contrasted with the much more borrower-friendly Commerce Note held by Mallegni.  *See supra* Section II. D. 1.  Simply put, Mallegni lied to 219 Forest, an entity in

which he had an ownership interest, and 201 Forest in order to vastly benefit his lending entity, LBM, and himself personally.

The Court realizes that this misrepresentation was made outside the four-year statute of limitations, but 219 Forest was not aware of the fact that Mallegni had purchased the Commerce Note until one week before trial. *See* Tr., Nov. 5, 2008, p. 151; Tr., Nov. 7, 2008, pp. 30-31. Moreover, there was no evidence that 219 Forest should have known that Mallegni repurchased the Commerce Note particularly since Mallegni did not exercise his bargained for right to receive the remaining 60% of 219 Forest. As such, the statute of limitations was tolled by the discovery rule. *See Lambert v. Fleet Nat'l. Bank*, 865 N.E.2d 1091, 1097 (Mass. 2007) ("A four-year statute of limitations applies to G.L. c. 93A claims. . . . Under the 'discovery rule,' this limitations period is subject to tolling until the plaintiff knew or should have known of the alleged injury."); *see also John Beaudette, Inc. v. Sentry Ins. A Mut. Co.*, 94 F.Supp.2d 77, 109-10 (D. Mass. 1999). Although the Court believes that it was grossly underhanded for Mallegni to have made this misrepresentation designed to lure 219 Forest into signing the December Note as part of his overarching goal of usurping 219 Forest's decision making process, 219 Forest did not show how it was actually damaged by it. *See, e.g.*, *McKernan v. Burek*, 118 F. Supp.2d 119 (D. Mass. 2000) ("for false . . . statements to be actionable under [93A], they must cause a loss to the plaintiff.").

The Commerce Note matured on August 31, 2002; 219 Forest produced no evidence of any financing alternative to the December Note that it was seeking or could have secured (or even qualified for) at that time. *See* Pls.' Agreed Ex. 21. Even if Mallegni had told 219 Forest that he held the Commerce Note and that he intended to foreclose if it was not refinanced, rather than emphasizing Commerce's phantom need to be repaid at the closing, 219 Forest did not show

that it would have had any option other than the December Note. As such, the Court cannot

determine what, if any, damages that 219 Forest suffered from being duped into signing the

December Note. *See Jardus v. Eastern Bank*, 805 N.E.2d 532 (Mass. App. Ct. 2004) ("claim

under c. 93A . . . require[s] evidence, beyond mere speculation, of damage[s] . . ."). While the

Court believes that it is quite possible that 219 Forest suffered damages consequent to Mallegni's

misrepresentation, it was 219 Forest's burden to show such damages. Its conclusory statement in

its proposed findings of fact and conclusions of law that LBM's conduct caused it to suffer the

costs of its Chapter 11 proceedings is not sufficient.

      2.      *Negotiations to extend the December Note*

      As previously discussed, Mallegni, acting on behalf of LBM, authorized Norris to

condition the extension of the December Note on the release of Norris from his lease with a third

party not involved in this lawsuit. *See* Tr., Nov. 5, 2008, p. 165-175; *supra* Sections I. J.,

II. D. 1. Mallegni has presumably benefitted from the attempt to procure the lease release by

collecting rent from Norris as Norris is a now tenant at the 171 Locke Drive building in

Marlborough that Mallegni, or one of his entities, owns. *See* Tr., Nov. 3, 2008, p. 125; Tr., Nov.

5, 2008, pp. 27, 42, 177.[29] Mallegni's complicity in the demand that 65 Boston Post Realty

Trust, a third party separate from 219 Forest, release his attorney from a substantial lease

obligation in exchange for an extension of 219 Forest's obligations under the December Note is

another example of Mallegni's total disregard for corporate entities and their distinctions. *See*

*supra* Section II. D. 1.

      In Massachusetts, "coercive or extortionate tactics designed to extract undeserved

concessions from other business entities" is actionable, unfair conduct under 93A. *See*

---

[29] Although the exact date that Norris moved into the building at Locke Drive is unclear, he moved out of the building at 65 Boston Post Road prior to the expiration of his lease; Norris testified that six or seven years were remaining on the lease as of the end of 2003. *See* Tr., Nov. 5, 2008, p. 43.

*Renovator's Supply, Inc. v. Sovereign Bank*, 892 N.E.2d 777, 787 (Mass. App. Ct. 2008).  In

*Renovators*, the borrower maintained a credit line that was renewed annually each July.  In the

summer of 2002, the lender regarded the borrower's credit line as an increased credit risk.  As

July 31, 2002 approached, the borrower's CPA had not yet completed its financial statement, so

the lender agreed to extend the renewal deadline to the end of October.  The lender met with the

borrower on October 3, and asked the borrower's principals if they would consider giving

additional security in addition to personally guaranteeing the credit line.  The principals rejected

the proposal and the lender's officers did not pursue the point or seek an increased rate as a

condition for renewal.  One of the bank officers concluded the meeting by stating that the only

remaining thing for him to do was "write it up."

Approximately one month later, the bank officer called the borrower and stated that

extension of the credit line was conditioned upon the principals granting the lender a lien on all

of their business assets and a 1% interest rate increase.  The borrowers brought an action

alleging, *inter alia*, violations of chapter 93A, § 11 and after a jury-waived trial, the Superior

Court found for the borrower.

The Appeals Court affirmed the Superior Court's verdict on the 93A count.  The Appeals

Court reasoned that the lender lulled the borrower past the deadline and "exploited" that timing

to attempt to force unwanted additional terms upon the borrower.  The Appeals Court found the

Superior Court's verdict appropriate in light of the fact that the lender's officers remained silent

up until November 1 regarding the renewal terms.  In conclusion, the Appeals Court stated that

the lender acted with a "strategy of unjustified delay and coercive pressure."

The facts of *Renovator's* are remarkably similar to the instant facts.  Similar to the lender

officers' failure to pursue the point of additional collateral or even mention an interest rate

increase in *Renovator's*, Mallegni did not propose any different or additional terms at the

December 19th meeting and merely stated that he would get back to Robert and David after he

spoke with Norris.  *See* Tr., Nov. 5, 2008, p. 157-158; *supra* Section I. J.  In response to a later

inquiry about the status of the extension, Mallegni told Robert "don't worry, Mike Norris, he's

really busy."  *See* Tr., Nov. 5, 2008, p. 159.  As of January 12, 2004, Robert had still not heard of

any additional or different terms than what were discussed at the December 19th meeting.  *See*

Tr., Nov. 5, 2008, p. 162.  Mallegni did not contradict the fact that, at this point, Robert had not

yet been informed that the lease release would be imposed as a condition to the extension. *See*

Tr., Nov. 3, 2008, pp. 121-128.  Furthermore, Mallegni had not told Robert anything to suggest

that were not close to consummating the extension agreement.

On January 28, 2004, Norris sent a letter to 219 Forest which, for the first time,

mentioned the lease release, and on January 30, 2004 Norris sent a subsequent letter that made it

an express condition to the extension.  *See* Pls. Exs. W, X.  Thus, from the initial December 19th

meeting up until January 28, 2004, 219 Forest was led to believe that an extension of the

December Note was in the works, but was never told that the lease release would be an

indispensable condition.  *Cf. Renovator's*, 892 N.E.2d at 788 (the bank officer "did not offer a

satisfactory explanation for the period of unbroken silence").  219 Forest relied on Mallegni's

assurance to not "worry" about the extension, as the evidence at trial demonstrated that 219

Forest did not seek alternative refinancing of the December Note during this one month and

eleven day window.  Then, 219 Forest was blindsided with a demand to release LBM's attorney

from a $600,000 obligation that 219 Forest had no authority to meet.[30]  This sequence of events

---

[30] That Mallegni did not care that 219 Forest was separate from the entity that was leasing to Norris further validates
the Court's finding that Mallegni has no respect for the distinctions of his (or anyone else's) corporate entities.

"lulled [219 Forest] to a point beyond its credit deadline and [LBM] exploited that timing in an attempt to force [an] unwanted additional . . . term[]" upon 219 Forest. *See id* at 787-88.

What makes LBM's actions particularly egregious is that fact that LBM made a demand that 219 Forest had no capacity to meet, while the principals of the plaintiff in *Renovator's* at least had the ability to agree to the terms demanded by the lender. LBM's demand to release its attorney from a $600,000 lease obligation and enable Mallegni to collect rent from its attorney, in exchange for a one-year extension of the December Note can only be characterized as "coercive" and "extortionate." As it was impossible for 219 Forest to meet LBM's demands, the Court concludes that LBM's actions were unfair[31] and would "raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings*, 396 N.E.2d at 153.

Evaluating whether LBM's conduct was unfair under the standard set forth in *Swanson*, yields the same conclusion. First, the Court finds that the equities between the parties indisputably tilt in 219 Forest's favor as 219 Forest made several attempts to negotiate an extension of the December Note on which it had been current at the time it matured, while LBM delayed the process and ultimately responded with a demand that was impossible for 219 Forest to meet. Second, 219 Forest's conduct in attempting to negotiate an extension of the December Note was in good faith. Third, 219 Forest had no knowledge, nor any reason to know, that LBM would seek to incorporate a condition into the extension of the December Note that it had no ability to meet. Finally, the Court finds that LBM knew or should have known that 219 Forest was without the authority to release Norris from his lease. At the least, LBM knew that 219 Forest had no ability to release Norris from his lease after the meeting in March of 2004, and yet LBM continued to insist on the release. *See* Tr., Nov. 5, 2008, pp. 173-174; Pls.' Ex. Y.

---

[31] As the lender in *Renovator's* was not contractually obligated to renew the credit line, LBM's argument that its demands did not violate 93A because LBM was not obligated to extend the December Note should meet the same fate.

Consequently, the Court concludes that LBM's conduct was unfair according to the standard pronounced in *Swanson*.

219 Forest attempted to extend the December Note, rather than refinance it with a new lender, because Wolfpen's looming veto power lodged 219 Forest between a rock and a hard place. 219 Forest had previously seen its efforts to refinance with an outside lender go up in smoke when Mallegni, acting on behalf of Wolfpen, threatened to veto the First Essex financing. Knowing that its efforts to seek refinancing through an outside lender were likely to be futile, 219 Forest was left with a single, bleak alternative— seek an extension of the December Note with LBM. Not surprisingly, LBM included a condition that it knew or should have known would render the extension an impossibility. LBM's successful attempt to make the assessment of the default interest unavoidable was a glaring violation of 93A.

The Court must now determine whether the lease release demand caused 219 Forest to suffer damages. LBM's attempt to incorporate the lease release prevented consummation of an extension as 219 Forest had no authority to grant a release. *See* Tr., Nov. 5, 2008, pp. 175, 207. Thus, 219 Forest was damaged by default interest rate charges that would not have accrued but for LBM's unfair demands. LBM's ledger illustrates that the default interest rate that accrued from January 20, 2004 through December 20, 2004 totaled $376,757.91.[32] As such, $376,757.91 assessed in default interest for 2004 was caused by LBM's unfair demands. As the parties were only negotiating a one-year extension, it would not be appropriate to find that the default interest assessed beyond 2004 was a result of the lease release demand. The Court will reduce these damages by the 3% extension fee ($52,010.64) that the parties had substantially agreed to and LBM required 219 Forest to pay in exchange for a one-year extension of the December Note.

---

[32] Using LBM's ledger for the December Note, this is derived from the sum of the default interest rate charges that were assessed on the December Note from January 20, 2004 through December 20, 2004, less two late payment fees. *See* Pls. Agreed Ex. 38.

See *supra* Section I. J.  Accordingly, 219 Forest suffered $324,747.27 in damages as a result of the unfair lease release demand.

        3.      *Requests for Payoff Figures*

219 Forest received a construction financing proposal from National City on September 27, 2005.  *See supra* Section I. K.  The financing would be used to develop the 219 Forest Property into a "63,308 square foot office condominium building" and the loan would have required interest only payments at the prime rate, which was 6.59% in September of 2005, and matured 24 months from the closing date.  *See* Pls.' Exs. BB, CC.  Mallegni ignored 219 Forest's requests for written payoff figures and verbally told Robert that the payoff figure was "around $3,500,000."  *See* Tr., Nov. 5, 2008, p. 190; *supra* Section I. K.  As Robert accurately informed Mallegni, the $3,500,000 figure was "ridiculous" and "incorrect."  According to LBM's own ledgers, and without factoring any of the Court's adjustments with respect to the default interest and the $32,459.11 payment, $3,037,237.89, as opposed to $3,500,000, was owed on the March and December Notes as of November 20, 2005.  *See* Pls.' Agreed Exs. 22 & 38.[33]  Mallegni's final attempt to sabotage 219 Forest's financial decision making and the commencement of its long overdue construction was an overwhelming success— the National City financing came to a halt and 219 Forest never secured a construction loan.

During this time that Mallegni was stonewalling Robert's requests for payoff figures, LBM had pledged the December Note to Danvers Bank to secure an obligation of Mallegni or one of his entities.  *See* Tr., Nov. 3, 2008, pp. 138-139; *supra* Section I. K.  Mallegni admitted that the investors in the December Note did not authorize LBM to pledge the December Note, and William testified that Mallegni never asked for his permission.  *See id.* pp. 140-141; Tr., Nov. 7, 2008, pp. 82-83.  Danvers Bank, rather than LBM's investors, would have received the

---

[33] $390,670.36 was owed on the March Note and $2,646,567.53 was owed on the December Note.

proceeds if 219 Forest had paid the December Note at this time.  The Court infers that Mallegni

refused to provide the payoff figures, at least in part, to conceal the degradation of his investor's

rights and to avoid having to pay his investors from another source, if in fact he had the ability so

to do.

Mallegni's refusal to provide 219 Forest with written payoff figures for the March and

December Notes was an unfair act under 93A.  219 Forest put LBM and Mallegni on notice that

it was taking steps to secure construction financing and that it required written payoff figures in

order to close on the financing.  Given Mallegni's extensive experience as a "lender," he had to

understand that accurate written payoff figures are vital to a borrower attempting to refinance.

Despite this notice, Mallegni brazenly refused to properly respond to 219 Forest's simple

request.  Mallegni's refusal to provide 219 Forest with written payoff figures was grossly unfair

because he knew that it was handcuffing 219 Forest's ability to proceed with its prospective

construction financing.  *Cf. T.W. Nickerson, Inc. v. Fleet Nat'l. Bank*, 898 N.E.2d 868, 880-881

(Mass. App. Ct. 2009) (interfering with lessee's right of first refusal by failing to provide lessee

of notice of an offer to purchase made by a third party ran afoul of 93A).

Although the Court concludes that Mallegni's refusal to provide 219 Forest with written

payoffs violated 93A, it is again uncertain as to what damages 219 Forest suffered from this

misconduct.  First, the National City proposal was to advance $2,000,000 to refinance the land.

*See* Pls.' Ex. CC; Tr., Nov. 5, 2008, pp. 210-211.  Even if the Court deducts the default interest

that accrued on the December Note during 2004, over $2,000,000 would still be owed on the

December Note as of November 20, 2005.  Turning to the March Note, even after the re-

application of the $32,459.11 payment, *see supra* Section II. C., $85,588.46 still remained owed

on the March Note as of June 17, 2002, and 219 Forest made no payments thereafter.  *See* Pls.'

Agreed Ex. 22; Pls.' Ex. P.  This figure does not include interest that accrued on the March Note

over the three year and five month period (July of 2002 – November 2005) when 219 Forest did

not make any payments on account of the March Note.  Accordingly, even if Mallegni had

provided 219 Forest with written payoff figures, it appears that 219 Forest may not have been

able to close on the construction financing with National City.  Moreover, the National City

proposal contained several conditions that 219 Forest might not have been able to meet.  For

example, it required that Depietri family to maintain $1,000,000 in liquid assets and $15,000,000

in aggregate net worth.  There was no evidence whatsoever that the Depietri family could have

met this condition.  Finally, the National City proposal expressly states that it is "*not a financing

commitment* and that approval by the appropriate loan committee as well as such other legal and

financial due diligence as is customary to transactions of this size and nature would be required

prior to the issuance of a binding commitment letter."  *See* Pls.' Ex. CC.[34]  Consequently, 219

Forest failed to meet its burden of proof that it would have secured construction financing with

National City if Mallegni had provided it with written payoffs.

     Although 219 Forest failed to prove that it could have actually secured the National City

financing if Mallegni had duly provided written payoff figures, 219 Forest did prove that it was

otherwise damaged by Mallegni's deliberate inaction.  219 Forest showed the National City

proposal to Mallegni who appeared satisfied and in no way suggested that he would be

uncooperative in the refinancing process.  *See* Tr., Nov. 5, 2008, p. 180.  Acting under the

reasonable expectation that Mallegni would provide written payoff figures,[35] 219 Forest returned

---

[34] The only evidence that National City was willing to proceed past the "proposal" stage was stricken as
inadmissible hearsay.  *See* Transcript, Nov. 5, 2008, pp. 182-183, 185-186.

[35] Possibly in response to the abusive conduct of lenders that has been ubiquitous in recent years, the Massachusetts
Legislature has recently enacted a statute that obligates lenders to provide written payoff figures upon request:

     [u]pon request of 1 or more obligors on a mortgage note, or an authorized person on
     behalf thereof, a mortgagee, mortgage servicer or note holder who is receiving payments

a signed copy of the proposal with a $10,000 deposit to National City. *See* Tr., Nov. 5, 2008, p.

181-182. Had 219 Forest known that Mallegni would not honor this reasonable expectation and,

instead, stonewall its requests, it would have had no reason to pursue the National City financing

and pay the $10,000 deposit. As such, Mallegni's unfair refusal to provide written payoffs

caused 219 Forest to suffer a loss of $10,000.[36]

    4.    *The $32,459.11 Payment*

      The misapplication of the $32,459.11 payment without authorization was also a violation

of 93A. *Cf. Xifaras v. Inv. & Leasing*, 752 N.E.2d 843 (Mass. App. Ct. 2001) (failure to account

for sale proceeds constituted violation of 93A); *supra* Section II. C. Although the payment was

misapplied sometime in 2002, 219 Forest did not become aware of it until July 2007. *See* Tr.

Nov. 5, 2008, p. 147. As such, the statute of limitations for the misapplication was tolled by the

discovery rule. *See supra* Section II. E. 1.

    5.    *Did LBM Willfully and Knowingly Violate Chapter 93A?*

      Finally, the Court must determine whether LBM willfully and knowingly violated 93A.

The statute provides that the Court *shall* award "up to three, but not less than two" times the

amount of the plaintiff's actual damages if the Court finds that the defendant's conduct was a

---

    under a mortgage note or other financial obligation secured by a mortgage described in
the payoff request *shall provide a written payoff statement sufficient to enable the
mortgagor or the authorized person to conclusively make full payment of the
outstanding indebtedness under the mortgage note or other financial obligation as of a
certain payment date, which shall be specified in the request and which shall be no
more than 30 days from the date of the request.* The payoff request shall be made in
writing but the writing may be provided by facsimile or other electronic forms of
transmission as may be requested or authorized by the party from whom the payoff is
being requested.

M.G.L. ch. 183, § 54D. This statute was not in effect when Mallegni rebuffed 219 Forest's
requests.

[36] Although Robert testified that 219 Forest also began the appraisal process, unfortunately there was no evidence
offered as to what expenses were incurred. Similarly, Robert's brief testimony that five or six companies "wanted"
to purchase multiple office condominium units for $5,000,000 is too thin and unsubstantiated for the Court to find
damages. *See* Tr., Nov. 5, 2008, p. 179.

"willful or knowing violation" of 93A.  Courts find willful or knowing violations of chapter 93A

when the defendant's conduct involves "coercion or extortion, . . . fraud or similar forms of

misrepresentation, . . . or abusive litigation."  *See Incase Inc. v. Timex Corp.*, 488 F.3d 46, 58 (1st

Cir. 2007).  Whether multiple damages should be awarded under chapter 93A is "factually

sensitive."  *Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 979 F. Supp. 919, 926 (D. Mass. 1997).

    The Court's factual findings compel the conclusion that LBM willfully and knowingly

violated 93A.  Mallegni deceived 219 Forest into signing the December Note by falsely stating

that Commerce needed to be paid off, he blindsided 219 Forest with an extortionate demand that

he *knew* 219 Forest had no ability to meet, and he derailed 219 Forest's efforts to refinance with

National City by ignoring 219 Forest's reasonable requests for payoff figures.  *Cf. Pepsi-Cola*

*Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 19 (1st Cir. 1985) (finding willful

violation of 93A where defendant "refused to pay, attempting to leverage [the Plaintiff] into

acquiescence with certain demands.").

    Once the Court finds a willful or knowing violation of 93A multiple damages must be

imposed, but the Court has the discretion to either double or treble those damages.  *See Dimtil*

*Med. Supplies v. Metropolitan Ins. Co.*, 69 Mass. App. Ct. 1117 (2007).  As Mallegni took the

aforementioned nefarious actions in order to execute his sinister schemes, the Court concludes

that the imposition of treble damages is justified.  LBM's 93A violations caused 219 Forest to

incur the assessment of $324,747.27[37] in default interest during 2004, the loss of the $10,000

deposit it made to National City in 2005, and the loss of the $32,459.11 payment and all interest

that accrued thereafter[38] on the March Note.  Trebling these figures produces a sum of

---

[37] The Court has reduced the default interest that accrued on the December Note during 2004 by the 3% extension
fee.  *See supra* II. E. 2.
[38] The Plaintiffs shall submit a calculation of additional interest that accrued on the March Note as a result of the
improper application of the $32,459.11 payment within 30 days.

$1,101,619.14.  Consequently, judgment shall enter for 219 Forest in the amount of

$1,101,619.14, three times the amount of interest that accrued on the March Note as a result of

the misapplication of the $32,459.11 payment, and reasonable attorney's fees and costs against

LBM.  219 Forest shall provide a detailed statement of its attorney's fees and costs associated

with its 93A claim within 30 days of this decision.

> 6.   _Mallegni's Personal Liability for 219 Forest's 93A claims (Count XII)_

219 Forest also seeks to recover from Mallegni in his individual capacity for LBM's 93A

violations.  Corporate officers can be "held liable under c. 93A for their personal participation in

conduct invoking its sanctions."  _Cmty. Builders, Inc_, 692 N.E.2d at 979; _Std. Register Co. v._

_Bolton-Emerson, Inc._ 38 Mass. App. Ct. 545, 550-52 (1995) (stating that corporate officers can

be personally liable for their misrepresentations made in violation of ch. 93A); _see also_

_Speakman v. Allmerica Finan. Life Ins._, 367 F. Supp.2d 122, 142 (D. Mass. 2005) (stating that a

corporation's parents, subsidiaries, or other affiliates can be liable under 93A if the corporation

played an "active role" in the alleged wrongful conduct).

Mallegni is LBM's manager and makes all of its business decisions.  Mallegni personally

misrepresented Commerce's need to be repaid at the December Note closing.  Furthermore,

Mallegni personally participated in the unfair lease release demand by authorizing Norris to send

the January 30, 2004 letter.  Finally, Mallegni personally refused to adequately respond to

Robert's requests for written payoffs.  In short, Mallegni carries on LBM as his alter ego.  As

Mallegni personally participated in LBM's conduct that ran afoul of 93A, he is personally liable

for 219 Forest's 93A damages.  _Cmty. Builders, Inc_, 692 N.E.2d at 979; _cf. In re Rowlands_, BAP

No. 08-047, pp. 9-11 (B.A.P. 1st Cir. Dec. 30, 2008) (imputing principal's failure to act to his

entity because of the "degree" and "level of control" he had over the entity).  Accordingly,

judgment shall enter for 219 Forest in the amount of $1,101,619.14, three times the amount of

interest that accrued on the March Note as a result of the misapplication of the $32,459.11

payment, and reasonable attorney's fees and costs against Mallegni.

       7.    *201 Forest's 93A claim (Counts X & XII)*

     201 Forest also seeks to recover from LBM and Mallegni under 93A.  The only evidence

presented with respect to conduct directed at 201 Forest was LBM and Mallegni's demand that

201 Forest guarantee 219 Forest's obligations on the December Note and grant LBM a mortgage

on the 201 Forest Property.  After Mallegni told Robert that he could refinance the Commerce

Note through LBM, Norris sent 219 Forest loan documents.  Included in those loan documents

was a guaranty and mortgage that 201 Forest was required to execute as a condition to LBM

making the loan to 219 Forest.  Mallegni told Robert that the guaranty and mortgage were

included because the putative investors of the December Note wanted collateral in addition to the

219 Forest Property.  Notably, William, one of the investors in the December Note, did not

corroborate Mallegni's testimony on this point.  *See supra* Section I. H.

     Notwithstanding Mallegni's explanation that his investors wanted additional collateral,

David and Robert objected to the requirement that 201 Forest guarantee the December Note.

Mallegni's response was typical; he again emphasized that Commerce needed to be repaid by the

end of the year.  *See* Tr., Nov. 5, 2008, pp. 154-155.  At the closing of the December Note,

Mallegni did not inform anyone on behalf of 201 Forest that Commerce no longer held the

Commerce Note, but instead, he falsely stated that Commerce needed to be repaid.  *See* Tr., Nov.

5, 2008, p. 151-152.  Although there was no direct testimony that David was present at the

closing, the 201 Forest Guaranty and mortgage were executed by David on the same date as the

December Note.  *See* Pls.' Agreed Exs. 27, 31, 32; Tr., Nov. 5, 2008, p. 151.  Moreover, Robert

testified that the 201 Forest Guaranty was a condition to the December Note. *See* Tr., Nov. 5,

2008, p. 155. Thus, it is implicit that the December Note and the 201 Forest Guaranty and

mortgage comprised one closing. Acting under this false belief and enormous pressure from

Mallegni, David executed the 201 Forest Guaranty in his capacity as 201 Forest's authorized

agent and executed the mortgage in his capacity as the trustee of 201 Forest Realty Trust. *See*

Pls.' Agreed Exs. 27, 31, 32; Tr., Nov. 5, 2008, p. 151. Inducing 201 Forest to execute the 201

Forest Guaranty and mortgage at the closing of the December Note under false pretenses was a

deceptive act in violation of 93A. *See, e.g.*, *Bump v. Robbins*, 509 N.E.2d 12, 21-22 (Mass. App.

Ct. 1987).

201 Forest asserts that LBM's unfair and deceptive acts caused it to incur the costs of its

Chapter 11 proceedings. After examining 201 Forest's bankruptcy schedules and statements, the

Court agrees. *See* Defs' Ex. 29. 201 Forest's Schedule A values it real property at

$4,845,493.00 encumbered by a first mortgage held by ING Annuity Life Insurance Company

("ING") in the amount of $4,548,974.00 leaving $296,519 in equity before LBM's mortgage is

factored into the equation. At the time of the bankruptcy filing, 201 Forest's non-priority

unsecured debts, excluding the security deposits of its tenants, totaled a mere $8,005.01.[39]

201 Forest's statement of financial affairs tells a story of a successful enterprise as 201

Forest's rental income increased each year— $1,213,262.00 in 2005, $1,330,814.00 in 2006, and

it was on pace to eclipse $1,500,000 in 2007 as 201 Forest had collected $732,310.00 as of the

June 19, 2007 bankruptcy filing. The statement of financial affairs also declares that 201 Forest

had not been a defendant in a lawsuit and its property had not been garnished, attached, or

foreclosed upon. Moreover, Robert Falcucci, the Chief Financial Officer of the entity that

manages 201 Forest's financial affairs, testified that 201 Forest is able to pay its bills as they

---

[39] The security deposits aggregate $46,810.33.

come due.  *See* Tr., Nov. 5, 2008, p. 100-101.  Finally, after taking judicial notice of the entries in 201 Forest's bankruptcy docket, the Court infers that 201 Forest has encountered no difficulty remaining current with its senior secured creditor as ING has not opposed any of 201 Forest's motions for authorization to use cash collateral and has never filed a motion for relief from the automatic stay.  *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket."); *see also Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n.3 (3rd Cir. 1991).  Taken together, 201 Forest's schedules and statements illustrate that it was a solvent entity that was not afflicted with any financial ills prior to being deceived into executing the 201 Forest Guaranty and mortgage on its property.  Consequently, the Court concludes that LBM's conduct was the direct cause of 201 Forest's bankruptcy filing.  For the same reasons enumerated *supra* Sections II. E. 5. & II. E. 6., the Court concludes that treble damages are appropriate and that Mallegni is also personally liable for such damages.  Accordingly, judgment will enter for 201 Forest against LBM and Mallegni for three times the cost and fees of 201 Forest's chapter 11 proceedings plus the reasonable attorney's fees and costs of prosecuting this 93A count.  201 Forest shall provide a detailed statement of its attorney's fees and costs associated with its 93A claim within 30 days of this decision.  201 Forest shall also provide a detailed statement of its costs and fees incurred in connection with its Chapter 11 bankruptcy proceeding through June 30, 2009 within 30 days of this decision.

## F.   Count VIII: Declaratory Judgment as to Validity of the 201 Forest Guaranty

201 Forest requests a declaratory judgment that the 201 Forest Guaranty is void because it was not supported by consideration, or in the alternative because it was obtained by misrepresentation, unfair and deceptive acts, or duress.

The burden to prove lack of consideration is on the party asserting it as a defense. *Leonard v. Woodward*, 25 N.E.2d 705, 707-08 (Mass. 1940). 201 Forest produced no evidence to show that the 201 Forest Guaranty was not supported by consideration. Moreover, actual consideration was not required because the 201 Forest Guaranty recites that it was executed as a sealed instrument. *See* Pls.' Agreed Ex. 31, ¶ 10; *Lawrence H. Oppenheim Co. v. Bloom*, 90 N.E. 7, 8 (Mass. 1950) ("[T]here was a recital in each that it was executed under seal, which under G.L. c. 4, § 9A, is sufficient to constitute a sealed instrument, and no actual consideration need be shown."). Even if consideration were required, the 201 Forest Guaranty can rest upon the same consideration that supports the December Note because the instruments were executed simultaneously. *See Davis-Hill Co. v. Wells*, 149 N.E. 693, 695 (Mass. 1925).

A contract that was induced by fraudulent misrepresentations is voidable. *See Shaw's Supermarkets, Inc. v. Delgiacco*, 575 N.E.2d 1115, 1117 (Mass. 1991); *Berenson v. French*, 159 N.E. 909, 913 (Mass. 1928). LBM argues that this theory is barred because the statute of limitations for misrepresentation is three years. *See* M.G.L. ch. 260, § 3. While it is true that a *tort* claim for misrepresentation is subject to a three year statute of limitations, it is not applicable to the instant facts as 201 Forest is seeking equitable relief on its contract with LBM under this count, rather than tort recovery, and is thus bound by the six year statute of limitations for actions on contract. *See Ballentine v. Eaton*, 8 N.E.2d 808, 810 (Mass. 1937); *Hudgens v. Harvard Univ.*, 1998 WL 1184179, at *2 (Mass. Super. Ct. 1998) ("In Massachusetts, the statutes of limitations applicable to law actions based on contract and tort are also applicable to suits in equity" (quoting *Palandjian v. Pahlavi*, 614 F. Supp. 1569, 1577 (D. Mass. 1985))); M.G.L. ch. 260, § 2. Accordingly, 201 Forest's misrepresentation theory is not barred by the statute of limitations.

The Court has found that Mallegni misrepresented the fact that Commerce needed the

Commerce Note repaid by the end of the year at the closing of the December Note.  Without

knowing that Mallegni had purchased the Commerce Note and acting under the mistaken belief,

created by Mallegni, that Commerce must be repaid by the end of the year, David, acting in his

capacity as 201 Forest's authorized agent, executed the 201 Forest Guaranty.  *See* Pls.' Agreed

Ex. 31.   Mallegni's misrepresentation that lured 219 Forest into signing the December Note

simply cannot be separated from David's execution of the 201 Forest Guaranty.  The December

Note and the 201 Forest Guaranty were executed on the same date.  Both instruments make up

one larger transaction that was spawned by Mallegni's misrepresentation regarding Commerce's

necessity to have the Commerce Note repaid by the end of the year.  Consequently, judgment

will enter declaring the 201 Forest Guaranty void as it was a product of Mallegni's

misrepresentation.

## G.     Count XI: The Covenant of Good Faith and Fair Dealing

219 Forest seeks to recover from LBM and Mallegni under the covenant of good faith

and fair dealing.  In Massachusetts, every contract "is subject to an implied covenant of good

faith and fair dealing."  *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473 (1991).

To recover under this theory, the aggrieved party must first establish that there was a binding

contract when the challenged conduct took place.  *See Smith v. Boston Edison Co.*, 62 Mass.

App. Ct. 1105 (2004) ("There being no binding contract on the subject, no implied covenant of

good faith and fair dealing existed."); *see also Laser Labs, Inc. v. ETL Testing Labs., Inc.*, 29 F.

Supp.2d 21, 24 (D. Mass. 1998) ("In order to show breach of the covenant, the plaintiff must

show that there existed an enforceable contract between the two parties.").

The covenant provides "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." *Drucker v. Roland Wm. Jutras Assocs., Inc.*, 370 Mass. 383, 385 (1976); *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004) ("The covenant is preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract."). The aggrieved party "must show a lack of good faith," but is not required to show bad faith. *Uno Restaurants, Inc.*, 441 Mass. at 384 n.5. The covenant governs the performance of contracts, but not their formation. *Renovator's*, 72 Mass. App. Ct. at 433. Finally, the covenant does not supply terms nor create rights or obligations that the parties did not include in their agreement. *Eigerman v. Putnam Investments, Inc.*, 450 Mass. 281, 287-88 (2007).

The Court must again address the statute of limitations. As a breach of the covenant of good faith and fair dealing claim is an action on contract, the statute of limitations is six years. *See Nortek Inc. v. Liberty Mut. Ins. Co.*, 843 N.E.2d 706, 711 (Mass. App. Ct. 2006). 219 Forest's allegations that Mallegni used threats designed to extract both a $100,000 exit fee and a 40% interest in 219 Forest when the August Note was refinanced and that Mallegni inflated the amount owed on the Wolfpen Note cannot form the basis of this claim because they are outside the six-year statute of limitations.

In *Renovator's*, discussed *supra* Section II. E. 2., the borrower also sought recovery under the covenant of good faith and fair dealing. *See Renovator's*, 72 Mass. App. Ct. at 433. The Appeals Court concluded that the borrower could not recover under the covenant of good faith and fair dealing because "Sovereign's actionable conduct related entirely to the *formation* of a further credit agreement and not to the *performance* of the existing agreement." *Id.* at 433-34. The Appeals Court reasoned that "[t]he distinction between formation and performance is

intelligible and fair" and precluding recovery under the covenant of good faith and fair dealing when objectionable conduct only relates to formation of an agreement does not leaves injured parties without recourse because "off-contract remedies such as estoppel and 93A standards" remain available.

Akin to the lender's conduct surrounding formation of a further credit agreement in *Renovator's*, LBM's act of conditioning the extension of the December Note on the release of Norris from his lease solely related to the attempted formation of an extension of the December Note. The December Note did not contain a provision regarding an extension. Thus, LBM's demand that Norris be released from his lease as a condition to an extension did not relate to performance of the December Note. Furthermore, the covenant may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship . . . ." *Uno Restaurants*, 441 Mass. App. Ct. at 385. As the terms of the December Note did not provide 219 Forest with the right to an extension, LBM's lease release demand cannot be said to have "destroy[ed] or injur[ed] the *right* of [219 Forest] to receive the fruits of the contract . . . ." *Drucker*, 370 Mass. at 385; *see also Albany St. Wholesale Florist, Inc. v. Boston Flower Exch.*, 70 Mass. App. Ct. 1106 (2007) ("If the contract is deemed to be the lease ending in November, 2001, the Exchange's refusal to renew or extend did not 'have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"). Consequently, LBM's lease release demand did not violate the covenant of good faith and fair dealing because it related solely to the formation of a new agreement, rather than performance of the December Note.

Similarly, Mallegni's misrepresentation that Commerce wanted to be repaid on the Commerce Note was not a breach of the covenant of good faith and fair dealing because it related solely to the formation of the December Note, not the performance of an agreement.

66

*See, e.g.*, *Desimone v. Compagnone*, 72 Mass. App. Ct. 1115 (2008) ("alleged failure to disclose material information about the condition of the property during the execution of the P & S cannot be the basis of a breach of the implied covenant of good faith and fair dealing."); *Winlake II, Inc. v. Mercier*, 21 Mass. L. Rptr. 166, 2006 WL 1360855, at \*5 (Mass. Super. Ct. 2006) ("Since the plaintiffs do not allege bad faith or breach in the performance of the Lease Agreement, but only in the conduct . . . leading up to the execution of the Lease Agreement, Hennessy's claim for a breach of the implied covenant of good faith and fair dealing must fail.").

LBM's refusal to provide 219 Forest with written payoff figures did, however, relate to LBM's performance of the March and December Notes because a borrower in any lending relationship has a reasonable expectation that its lender will provide accurate written payoff figures upon reasonable request.  The Court concludes that LBM's refusal to provide written payoff was a breach of the covenant of good faith and fair dealing especially because LBM knew that 219 Forest required such information in order to proceed with construction financing with National City.  As explained *supra* Section II. E. 3., 219 Forest proved a loss of $10,000 from these transgressions.  Accordingly, judgment will enter for 219 Forest in the amount of $10,000 against LBM.

### *Mallegni's Personal Liability for the Covenant of Good Faith and Fair Dealing*

The principal contracts at issue in this case, the March Note and the December Note, were entered into by and between LBM and 219 Forest.  *See* Pls.' Agreed Exs. 16, 27.  The evidence presented at trial, however, also established that Mallegni entered into two contracts in his individual capacity.  Recovery against Mallegni under a fiduciary duty theory pursuant to 219 Forest's LLC membership agreement, which Wolfpen was a party to by virtue of its 40% membership interest in 219 Forest, for self-dealing that Mallegni seemingly engaged in was not

sufficiently pled, nor was it proven.  In the first contract, Mallegni agreed to purchase 219

Forest's obligations owed under the Commerce Note in the event that 219 Forest defaulted on

the Commerce Note.  *See* Pls.' Agreed Ex. 17 ("first contract").  In exchange for Mallegni's

agreement to sign the first contract, 219 Forest and Mallegni entered into the March Agreement.

The March Agreement provided that Mallegni would become Successor Trustee of 219 Forest,

would be appointed as the party to sign documents for 219 Forest, and would be assigned a 60%

membership interest in 219 Forest if he was required to purchase 219 Forest's obligations owed

under the Commerce Note.  *See* Pls. Agreed. Ex. 18.

Mallegni fully performed his obligations under the first contract by purchasing 219

Forest's obligations under the Commerce Note on November 27, 2002.  With respect to the

March Agreement, Mallegni's main obligation was to sign the first contract.  *See* Pls.' Agreed

Ex. 18, ¶¶ 2-3.  It is undisputed that Mallegni signed the first contract.  *See* Pls. Agreed. Ex. 17.

The remaining provisions of the second contract imposed obligations on 219 Forest, David, and

Kimberly and gave rights to Mallegni in the event that the first contract was enforced against

Mallegni.  The Court has also found that the March Agreement required the application of the

Cranston Commons reimbursements to the March Note.  *See supra* Section II. C.  In

contravention of this obligation, the $32,459.11 payment was not applied to the March Note.  As

a party to this agreement, Mallegni injured 219 Forest's right to have the Cranston Commons

reimbursements applied to the March Note.  The Court infers that the $32,459.11 payment was

not applied to the March Note in bad faith because 219 Forest was not obligated on the loans to

which the payment was allegedly re-applied.  *See supra* Section II. C.  As such, Mallegni

breached the covenant of good faith and fair dealing and judgment will enter for 219 Forest

against Mallegni in the amount of $32,459.11 and the readjustment of interest that accrued thereafter.

219 Forest asserts that Mallegni breached the covenant of good faith and fair dealing when he refused to agree to the construction financing proposed by First Essex in March or April of 2002. As stated, a party seeking to recover for a breach of the covenant of good faith and fair dealing must first establish that it had a contract with the offending party. *Laser Labs*, 29 F. Supp.2d at 24. It would appear that 219 Forest's theory is that it had some type of a contract with Mallegni by virtue of the fact that Wolfpen, which Mallegni owns 50% of, owns a 40% interest in 219 Forest. Even if this is a viable theory, 219 Forest failed to prove that Mallegni's refusal to agree to the First Essex construction financing breached the covenant of good faith and fair dealing.

Robert gave a copy of the First Essex proposal to Mallegni to review because any of 219 Forest's financing required Wolfpen's prior approval. The next day, Mallegni told Robert that he would not agree to the First Essex proposal because he spoke with Massad at Commerce and Commerce wanted to do the construction financing.[40] Mallegni told Robert that Commerce felt that it was owed the opportunity to do the construction financing because it had previously helped 219 Forest by lending under the Commerce Note in March of 2001. This was the second time that Mallegni brought Commerce into the fold as he previously "assisted" 219 Forest in procuring the Commerce Note. *See supra* Section I. E. This time, however, Mallegni's decision to bring in Commerce was completely unsolicited by 219 Forest, and was, notably, an abrupt response to 219 Forest's attempt to refinance its obligations through an "outside" lender. Robert

---

[40] Although the Court strongly suspects otherwise, there was no direct evidence that Mallegni would have derived any personal benefit or gain if Commerce had made a construction loan to 219 Forest.

was disappointed with Mallegni's demand to use Commerce because Robert and David had a long-standing relationship with First Essex.

Commerce issued a construction financing proposal that "mirrored" the terms of the First Essex proposal which David, Robert, and Mallegni signed and sent back to Commerce. *See* Pls. Ex. O; *supra* Section I. G. Commerce eventually issued a revised commitment that was approximately $1,500,000 less than the initial proposal. *See supra* Section I. G. 219 Forest never closed on construction financing with Commerce, at least in part, because Commerce decreased the amount that they had initially proposed to lend. Robert testified that he was "happy" with Commerce's initial proposal and that Mallegni had nothing to do with Commerce's ultimate decision to decrease the amount of the proposal. *See* Tr., Nov. 5, 2008, pp. 204-205.

If Mallegni had flatly refused to agree to any constructing financing the Court would not hesitate to find that Mallegni breached the covenant of good faith and fair dealing. However, that is not what took place. Rather, Mallegni insisted on pursuing construction financing through a lender different than the lender that Robert wanted to use. The lender that Mallegni preferred, Commerce, duly sent 219 Forest a proposal that "mirrored" the terms of the First Essex proposal, and Robert was "happy" with the proposal. According to Robert, Mallegni was not the cause of, nor was he in any way involved with, Commerce's decision to lower the amount of the proposal. *See* Tr., Nov. 5, 2008, pp. 204-205. This may be a very naive belief on Robert's part given Mallegni's failure to protest and his otherwise docile attitude in the face of Commerce's decision to dramatically lower the amount of the proposal. Although there was not sufficient evidence presented at trial to support such a finding, the Court is very suspicious that the extent of Mallegni's relationship with, or interest in, Commerce is something more than a friendly business relationship cultivated from prior dealings. Nevertheless, it was 219 Forest burden to

prove that Mallegni breached the covenant of good faith and fair dealing.  The evidence, as presented, was that Mallegni refused to pursue construction financing with the lender that Robert proposed, but ultimately signed off on a proposal with Commerce that contained the same terms as the First Essex proposal and that Robert was "happy" with.  This conduct, without actual proof of the Court's suspicions, did not violate the covenant of good faith and fair dealing.

As Mallegni breached the covenant of good faith and fair dealing by misapplying the $32,459.11 payment, judgment will enter for 219 Forest on this Count as against Mallegni.

### *201 Forest's Covenant of Good Faith and Fair Dealing Claim*

201 Forest also seeks to recover from LBM and Mallegni under the covenant of good faith and fair dealing.  The only agreements presented at trial that 201 Forest was a party to were the 201 Forest guaranty and the mortgage on its property that it granted to LBM.  Robert testified that these agreements were *formed* in connection with the December Note, but there was no testimony regarding the performance or non-performance of these agreements.  Consequently, judgment will enter for the Defendants on 201 Forest's covenant of good faith and fair dealing claim.

## III.   OBJECTIONS TO LBM'S CLAIMS

### A.   *The 201 Claim* [41]

The 201 Claim is supported by the 201 Forest Guaranty.  As the Court has declared that the 201 Forest Guaranty is void as a product of misrepresentation, the 201 Claim is disallowed in full.

---

[41] 201 Forest Street, Case No. 07-42296, Docket # 79.

B.   *The 219 Claim*

Although 219 Forest did not specifically request the disallowance of LBM's attorney's fees, it requested that LBM's claims be disallowed "in full."  Thus, it is implicit that 219 Forest is also seeking the disallowance of LBM's attorney's fees.  A properly filed proof of claim is entitled to a presumption of prima facie validity.  *See In re Lowenstein*, 361 B.R. 326, 334 (Bankr. D. Mass. 2007).  An oversecured creditor filing a proof of claim is also entitled to recover "reasonable" attorney's fees if the agreement under which the claim arose entitles the creditor to such fees.  *See* 11 U.S.C. § 506(b); *In re Campbell*, 402 B.R. 453, 461 (Bankr. D. Mass. 2009).  The December and March Notes entitle LBM to recover its attorney's fees.  A creditor seeking attorney's fees bears to burden to prove the reasonableness of the fees by a preponderance of the evidence, *see In re Campbell*, 402 B.R. at 461, and is generally required to provide a "detailed description of the services rendered." *In re Saunders*, 130 B.R. 208, 212 (Bankr. W.D. Va. 1991); *See In re Regan*, 2009 WL 1067197, at * 2, * 7 (Bankr. D. Mass. 2009) (Feeney, J.) (disallowing mortgagee's claim for attorney's fees because the mortgagee "did not provide the Court with any information or documentation about when precisely attorneys' fees were incurred and for what purpose."); *In re Prevo*, 394 B.R. 847, 849 (Bankr. S.D. Tex. 2008) (sustaining objection to proof of claim for foreclosure fees and costs when mortgagee "failed to submit any documentation supporting the foreclosure fees and costs . . . [because] it is impossible for the Court to determine whether or not they are reasonable."); *In re Ransom*, 361 B.R. 895, 902-03 (Bankr. D. Mont. 2007) (sustaining objection to creditor's proof of claim for attorney's fees because, *inter alia*, "no hourly itemization exist[ed] in the proof of claim.").

The 219 Claim includes $60,092.57 for attorney's fees on a single line and no documentation or itemization of the services from which these fees arose was attached.

Moreover, LBM did not introduce any evidence at trial to substantiate its request for these attorney's fees.  The time has come and gone for LBM to prove the validity and accuracy of these attorney's fees.  As the 219 Claim did not document LBM's request for attorney's fees and there was no evidence presented at trial concerning the attorney's fees, "it is impossible for the Court to determine whether or not they are reasonable."  *See In re Prevo*, 394 B.R. at 849.  Consequently, LBM failed to prove that its attorney's fees were reasonable and they will be disallowed in full.

With respect to the remainder of the 219 Claim, counsel to 219 Forest shall provide the Court with an order, supported by detailed mathematical computations that take into account the Court's findings herein, proposing the proper treatment of the 219 Claim within 30 days of the date of this decision.

## IV.    CONCLUSION

1.  With respect to **Count I**: Judgment for Plaintiff, 219 Forest, as follows:

A.  The default interest charged in connection with the December Note is DISALLOWED.

B.  The late fees for the December Note are reduced from 10% to 5%.

C.  The Plaintiff 219 Forest is to file a statement jointly with 201 Forest detailing the recalculation of the amounts to be credited to the Plaintiffs with respect to the December Note within 30 days of the date of this Memorandum of Decision.  The Defendants shall have 14 days after the recalculation pleading is filed to respond.

2.  With respect to **Count II**: Judgment for the Defendants with respect to the issue of the extension of the December Note.  The Plaintiffs are to recalculate the amount with respect to the December Note in accordance with the provisions of this Memorandum of Decision.

73

3.  With respect to **Count III**: Judgment for the Plaintiff 219 Forest as follows:

A.  The default interest charged in connection with the March Note is

DISALLOWED.

B.  The late fees for the March Note are reduced from 10% to 5%.

C.  The Plaintiff 219 Forest is to file a statement detailing the recalculation of the

amounts to be credited to the Plaintiff with respect to the March Note within 30 days of the date

of this Memorandum of Decision.  The Defendants shall have 14 days after the recalculation

pleading is filed to respond.

4.  With respect to **Count IV**: Judgment for Plaintiff 219 Forest as follows:

A.  $32,459.11 is to be reapplied to the March Note as of June 17, 2002, with

principal and interest (at the non-default rate) payments recalculated to reflect the reapplication.

B.  The Plaintiff 219 Forest is to file a statement detailing the recalculation of the

amounts to be credited to the Plaintiffs in light of the above within 30 days of the date of this

Memorandum of Decision.  The Defendants shall have 14 days after the recalculation pleading is

filed to respond.

5.  With respect to **Count V**: Judgment for the Plaintiff 219 Forest as follows:

Defendant LBM'S allowed claim shall be and hereby is subordinated to all of 219

Forest Street LLC's unsecured creditors.

6.  With respect to **Count VI**: Judgment for Plaintiff 219 Forest against Defendant LBM

as follows:

A.  Treble damages in the amount of $1,101,619.14 plus three times the amount

of interest that accrued on the March Note as a result of the misapplication of the $32,459.11

payment.  The Plaintiffs shall submit a calculation of additional interest that accrued on the

March Note as a result of the misapplication of the $32,459.11 payment within 30 days of this

Memorandum of Decision.  *See supra* footnote 38.  The Defendants shall have 14 days to

respond.

       B.   Reasonable costs and attorney's fees for prosecuting the Chapter 93A claim.

Plaintiff 219 Forest is to file an application for compensation in accordance with the MLBR

2016 within 30 days of the date of this Memorandum of Decision.  The Defendants shall have 14

days from the filing of the application in which to file an objection.

    7.  With respect to **Count VIII**:  Judgment for Plaintiff 201 Forest.  201 Forest Street

LLC's guaranty is hereby declared to be null and void.

    8.  With respect to **Count IX**: Judgment for Plaintiff 201 Forest as follows:

       A..  The default interest charged with respect to the December Note is

DISALLOWED.

       B.  The late fees for the December Note are reduced from 10% to 5%.

       C.  The Plaintiff 201 Forest is to file a statement jointly with Plaintiff 219 Forest

detailing the recalculation of the amounts to be credited to the Plaintiffs with respect to the

December Note in light of the above within 30 days of the date of this Memorandum of

Decision.  The Defendants shall have 14 days after the recalculation pleading is filed to respond.

    9.  With respect to **Count X**: Judgment for 201 Forest against LBM as follows:

       A.  Three times the cost and fees of 201 Forest Street LLC's chapter 11

proceedings through June 30, 2009.  201 Forest Street shall file a statement of costs and fees

within 30 days of the date of this Memorandum of Decision.  The Defendants shall have 14 days

from the filing of the application in which to file an objection.

B. Reasonable costs and attorney's fees for prosecuting the Chapter 93A claim.
201 Forest is to file an application for compensation in accordance with the MLBR 2016 within
30 days of the date of this Memorandum of Decision.  The Defendant shall have 14 days within
which to file an objection.

10.  With respect to **Count XI**:

(I) Judgment for Plaintiff 219 Forest as follows:

A. Damages in the amount of $10,000 against LBM.

B. Damages in the amount of $32,459.11 against Mallegni.

(II) Judgment for Defendants with respect to Plaintiff 201 Forest.

11.  With respect to **Count XII**:

(I) Judgment for 219 Forest against Mallegni as follows:

A. Treble damages in the amount of $1,101,619.14 plus three times the amount
of interest that accrued on the March Note as a result of the misapplication of the $32,459.11
payment.  The Plaintiffs shall submit a calculation of additional interest hat accrued on the
March Note as a result of the misapplication of the $32,459.11 payment within 30 days of this
Memorandum of Decision.  *See supra* footnote 38.  The Defendants shall have 14 days to
respond.

B. Reasonable costs and attorney's fees for prosecuting the Chapter 93A claim.
219 Forest Street is to file an application for compensation in accordance with the MLBR 2016
within 30 days of the date of this Memorandum of Decision.  The Defendant shall have 14 days
within which to file an objection.

(II) Judgment for 201 Forest against Mallegni as follows:

A.  Three times the cost and fees of 201 Forest's chapter 11 proceedings through June 30, 2009.

B.  Reasonable costs and attorney's fees for prosecuting the Chapter 93A claim. 219 Forest Street is to file an application for compensation in accordance with the MLBR 2016 within 30 days of the date of this Memorandum of Decision.  The Defendant shall have 14 days within which to file an objection.

12.  The 219 Claim is ALLOWED only to the extent consistent with this Memorandum of Decision.  The Debtors are to provide detailed accounting as set forth above.[42]  After the accounting is filed and the Defendants have had an opportunity to respond, the Court will hold a further hearing in necessary or issue a final order with respect to the final monetary award, including disgorgement of money previously paid to LBM, if appropriate, after considering all of the reductions set forth herein.

A separate order will issue.

June 30, 2009                                            By the Court,

_____
Joel B. Rosenthal
United States Bankruptcy Judge

---

[42] 201 Forest filed its Objection to LBM's claim in the chapter 11 case.  A separate Order sustaining the Objection and disallowing LBM's claim against 201 Forest is issued contemporaneously herewith.